**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN RADIO SERVICES CO., an
Oregon corporation,
    *Plaintiff-Appellant,*

    v.

QWEST CORPORATION, a Colorado
corporation; THE PUBLIC UTILITY
COMMISSION OF OREGON; LEE BEYER
Chairman; RAY BAUM,
Commissioner; JOHN SAVAGE,
Commissioner,
    *Defendants-Appellees.*

No. 05-35796

D.C. No.
CV-05-00159-ALA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, U.S. District Judge, Presiding

Argued and Submitted
November 6, 2007—Portland, Oregon

Filed July 9, 2008

Before: Edward Leavy, Raymond C. Fisher and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Marianne G. Dugan (argued), Eugene, Oregon, for Western Radio Services Co., plaintiff-appellant.

Alex M. Duarte (argued), Portland, Oregon, Qwest Corporation, Gregory B. Monson, Salt Lake City, Utah, and Timothy W. Snider, Portland, Oregon, Stoel Rives, LLP, for Qwest Corporation, defendant-appellee.

Erin C. Lagesen, Office of the Oregon Attorney General, Salem, Oregon, for Lee Breyer, Chairman, Public Utility Commission of Oregon, defendant-appellee.

## OPINION

BERZON, Circuit Judge:

Under the Telecommunications Act of 1996 ("1996 Act"), Pub. L. No. 104-104, 110 Stat. 56 (1996), "incumbent" local exchange carriers are required to enter into interconnection agreements with newer local exchange carriers. If the two carriers cannot reach agreement through negotiation, either party may petition the state's public utilities commission to request arbitration of any open issues.

Western Radio Services Co. ("Western") filed a petition with the Oregon Public Utilities Commission ("PUC") requesting arbitration of its attempts to establish an interconnection agreement with Qwest Corporation ("Qwest"), an incumbent carrier. The arbitrator found for Qwest on nearly every issue and ordered the parties to submit within 30 days an interconnection agreement consistent with his decision for final approval by the PUC. Qwest drafted an interconnection agreement that it maintained accorded with the arbitrator's decision, but Western refused to sign it. Instead, Western brought this action, contending that Qwest had failed to negotiate in good faith under the 1996 Act, and that the PUC and its Commissioners had violated its constitutional rights under 42 U.S.C. § 1983. In the meantime, Qwest submitted its draft agreement to the PUC.

The district court dismissed the good faith cause of action for lack of jurisdiction and the § 1983 cause of action as unripe. Shortly after the district court's decision, the PUC approved the interconnection agreement submitted to it by Qwest, ruling that it complied with the arbitration order.

Western appeals the district court's decision. We hold that, whether or not there is a private right of action encompassing its good faith claim, Western may not sue Qwest for a failure to negotiate in good faith until the PUC has addressed Western's good faith claim. There has now, however, been a determination by the PUC approving an interconnection agreement, which may represent a decision by the agency on Western's good faith claim. We therefore remand to the district court to allow it to consider in the first instance whether the PUC's decision is sufficient to permit adjudication of Western's good faith claim in district court and, if so, to address in the first instance the availability of such an action under 47 U.S.C. § 207. We also remand the § 1983 cause of action to the district court, so that it may consider whether the PUC determination affects its conclusion that the § 1983 claim was unripe.

## STATUTORY FRAMEWORK

The Telecommunications Act of 1934 ("1934 Act"), 48 Stat. 1064, "granted the [Federal Communications Commission] broad authority to regulate interstate telephone communications." *Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 127 S. Ct. 1513, 1516 (2007). Under the 1934 Act, carriers filed tariffs with the Federal Communications Commission ("F.C.C.") which would then approve them or, in some cases, set them aside or alter them. *Id.* The 1934 Act requires that "[a]ll charges, practices, classifications, and regulations for and in connection with" provision of telecommunications services be "just and reasonable," and declares

unlawful any "charge, practice, classification, or regulation that is unjust or unreasonable." 47 U.S.C. § 201(b).[1]

The 1934 Act also authorizes persons harmed by the actions of any "common carrier"[2] to recover damages:

> In case any common carrier shall do, or cause or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained . . . .

§ 206; *see also* § 153(32) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation."). A person seeking damages under § 206 "may either make complaint to the Commission . . . , or may bring suit for the recovery of damages . . . in any district court of the United States." § 207.

The Telecommunications Act of 1996 ("1996 Act") introduced a competitive regime for local telecommunications services. *See Verizon California, Inc. v. Peevey*, 462 F.3d 1142, 1146 (9th Cir. 2006). Before adoption of the 1996 Act, "local telephone service was provided primarily by a single company within each local area." *Id*. Under the new regime, "incumbent local exchange carriers," such as Qwest, are obligated to provide "interconnection" to newer local

---

[1]All statutory citations are to Title 47 of the United States Code unless otherwise indicated.

[2]A "common carrier" is defined as:

> any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter.

§ 153(10).

exchange carriers, called "requesting" carriers in the statute. § 251(c)(2).

"Interconnection allows customers of one [local exchange carrier] to call the customers of another, with the calling party's [local exchange carrier] . . . , transporting the call to the connection point, where the called party's [local exchange carrier] . . . takes over and transports the call to its end point." *Verizon California*, 462 F.3d at 1146. The 1996 Act lays out a number of substantive requirements for the quality and nature of interconnection that must be provided. These include, for example, a requirement that interconnection be provided "at any technically feasible point within the carrier's network" and that it be "at least equal in quality" to the interconnection that the incumbent carrier provides to itself. § 251(c)(2)(A)-(C).

If a carrier requests interconnection, the requesting carrier and the incumbent carrier to whom the request is made have a duty to "establish reciprocal compensation arrangements for" interconnection. § 251(b)(5). In creating such an interconnection agreement, both the incumbent carrier and the requesting carrier have a "duty to negotiate in good faith . . . the particular terms and conditions" of such agreements. § 251(c)(1). The 1996 Act sets out a procedural framework for these negotiations: First, a requesting carrier must make a request for interconnection to an incumbent carrier, which "may negotiate and enter into a binding agreement with the requesting . . . carrier . . . without regard" to the substantive standards of § 251. § 252(a)(1). The parties to the negotiation may, if they wish, ask a state public utilities commission "to mediate any differences arising in the course of the negotiation." § 252(a)(2).

If the parties cannot reach agreement through voluntary negotiations or mediation, either may "petition a State commission to arbitrate any open issues." § 252(b)(1). In resolving the open issues through compulsory arbitration, a state

commission must ensure that its resolution "meet[s] the requirements of section 251" and may "impos[e] appropriate conditions" in order to ensure, among other things, that the requirements of § 251 are met. § 252(b)(4)(C), (c)(1). If at any point during the arbitration either party refuses "to participate further in the negotiations, to cooperate with the State commission . . . , or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission," such action "shall be considered a failure to negotiate in good faith." § 252(b)(5). Section 252 does not specify what remedy, if any, is available for failure to negotiate in good faith.

Once an interconnection agreement has been adopted either by negotiation or after compulsory arbitration, it must "be submitted for approval" to the state commission, which must either "approve or reject the agreement." § 252(e)(1). Finally, the 1996 Act provides for judicial "[r]eview of State commission actions":

> In any case in which a [PUC] makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

§ 252(e)(6).

## PROCEDURAL HISTORY

In October of 2003, Western requested negotiations with Qwest to establish an interconnection agreement allowing Western access to Qwest's network in Oregon. The negotiations failed to resolve all the issues between the parties. Western thereupon filed a petition for arbitration with the Oregon PUC. Before the arbitrator, the parties submitted a stipulation of facts as to two issues, stipulated that they had resolved three other issues, submitted testimony, and filed opening and

responsive briefs. The arbitrator issued a decision on September 20, 2004.

In his decision, the arbitrator ordered that Qwest's proposed language be adopted as to all but one issue. The arbitration order instructed that "[w]ithin 30 days of the date of the [PUC's] final order in this proceeding, Qwest and Western shall submit an interconnection agreement consistent with the terms of this decision." Western filed exceptions to the arbitrator's order with the PUC, but, on October 18, 2004, the PUC adopted the arbitrator's decision in its entirety.

On November 10, Qwest prepared a proposed interconnection agreement, signed it, and sent it to Western by overnight courier. A week later, on November 18, Qwest notified the PUC that Western had "informed Qwest that it had been unable to complete its review of the agreement, and would not likely be able to do so for a few weeks," that is, not until well after the thirty-day deadline set by the arbitrator. Instead of waiting for Western, Qwest enclosed a copy of the agreement that it had already signed and transmitted to Western "for the [PUC's] information, and approval, if appropriate." According to Western, it subsequently reviewed the proposed agreement on November 29 and December 1, 2004, and sent e-mails to Qwest on those dates indicating that it did not believe the agreement was in compliance with the arbitrator's order. The record does not indicate what action, if any, Qwest took in response to the e-mails.

Western did not inform the PUC of its concerns about Qwest's proposed interconnection agreement. Instead, on February 3, 2005, Western filed this action, naming as defendants Qwest, the PUC, and several PUC Commissioners in their official capacities. Western alleged that the district court had jurisdiction over its suit "pursuant to 47 U.S.C. § 252(e)(6), 42 [sic] U.S.C. § 207, and 28 U.S.C. §§ 1331 and 1343(a)."

In its complaint, Western's first cause of action attacked the PUC's resolution of all the issues it had raised before the agency concerning the terms of the interconnection agreement. The second cause of action alleged that Qwest's failure to correct the proposed agreement constituted a failure to negotiate in good faith under 47 U.S.C. §§ 251(c) and 252(A). Western alleged that Qwest's proposed interconnection agreement did not comply with the PUC's order in four ways, and that when this noncompliance was brought to Qwest's attention, Qwest "refused to negotiate in good faith to resolve the problems."

In its third and fourth causes of action, both brought under 42 U.S.C. § 1983, Western alleged that the PUC and its Commissioners violated Western's constitutional rights by adopting the arbitrator's order. For Qwest's failure to negotiate in good faith, Western sought a declaratory judgment and damages. For the PUC's violations of the Constitution, Western sought injunctive relief and damages.

The defendants moved to dismiss all causes of action for lack of subject-matter jurisdiction and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6). In its motion to dismiss, Qwest argued that the court had no jurisdiction to consider any of the causes of action until the PUC approved or rejected an interconnection agreement; that the court had no jurisdiction to consider the "good faith" cause of action because it had not been decided by the PUC; and that the good faith cause of action "is wholly outside the jurisdiction of this Court even after the [PUC] approves or rejects an agreement." The PUC and its Commissioners ("state defendants") similarly maintained that the district court had no jurisdiction over the second cause of action, because Western had not presented its "good faith" claim to the PUC and because the PUC had yet to approve or reject any interconnection agreement. The state defendants also contended that Western's § 1983 causes of action were barred by the Eleventh Amendment and by absolute and qualified immunity.

The district court, in an opinion and order filed on July 25, 2005, dismissed the entire action. Turning first to subject-matter jurisdiction but not indicating which causes of action it was examining, the court held that under § 252(e), "court review is premature and barred" until the PUC has approved or rejected an agreement. The court explained that, in its view, this conclusion "not only comports with a plain reading of the Act and judicial decisions, it also is supported by sound policy." The court went on to hold that Western's second cause of action for failure to negotiate in good faith "is barred for the reason that the Act does not permit parties to adjudicate such claims in federal court." According to the district court, such a claim can only be "remedied through the mediation and arbitration process before the [PUC]." In so ruling, however, the district court did not consider the possibility that § 207 supplies a cause of action such as the one Western seeks to pursue.

Reaching the 42 U.S.C. § 1983 claims, the district court stated only:

> Finally, regarding plaintiff's third and fourth claims for relief pursuant to 42 U.S.C. § 1983 for money damages, the PUC's well founded motion to dismiss is denied with leave to renew upon this court obtaining proper jurisdiction over this matter.

Western responded by filing this appeal.[3]

After the notice of appeal in this case had been filed, Qwest, over Western's objection, sought PUC approval of the interconnection agreement it had submitted. Western asked that the PUC take no action on the interconnection agreement,

---

[3]Western has not appealed dismissal of its first cause of action challenging the PUC's resolution of the substantive issues, but has indicated its intention instead to refile it in federal district court now that an interconnection agreement has been approved.

but the PUC approved the version of the interconnection agreement submitted by Qwest.[4]

## ANALYSIS

### I.  "Good Faith" Claim.

We turn first to the question whether the district court had jurisdiction over Western's good faith claim, and hold that it did. We then consider whether, as a prudential matter, Western may bring its good faith claim in district court before it has been addressed by the PUC. Concluding that it cannot, we remand to the district court to consider whether the PUC decision approving the agreement adequately fulfills the requirement that the PUC first address any good faith claim and, if so, to determine whether Western has a cause of action under § 207 for an incumbent local exchange carrier's failure to negotiate in good faith.

### A.  Jurisdiction.

Qwest maintains that the district court did not have subject-matter jurisdiction over Western's good faith claim because the PUC had not made a "determination" to approve or reject an interconnection agreement. *See* § 252(e)(6) ("In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court . . . ." ). We conclude that, contrary to Qwest's contentions, whatever finality or exhaustion requirement § 252(e)(6) might impose does not affect the subject matter jurisdiction of the

---

[4]We take judicial notice of the PUC's order because its existence is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 435 (9th Cir. 1992) (taking judicial notice of the existence of decisions of the California Public Utility Commission on *force majeure* claims).

district court in this case. Rather, the district court has general federal question jurisdiction under 28 U.S.C. § 1331 to determine whether there is a cause of action under § 207 for Western's "good faith" claim.

**[1]** 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Section 1331 jurisdiction covers, inter alia, cases in which a plaintiff's "right to relief depends upon the construction or application" of federal law. *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921); *see also Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 27-28 (1983) (holding that federal question jurisdiction under § 1331 exists when "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law").

In *Verizon Maryland Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635 (2002), the Supreme Court addressed the interaction between 28 U.S.C. § 1331 and 47 U.S.C. § 252. Verizon brought an action in district court challenging the Maryland Public Service Commission's interpretation of an interconnection agreement earlier approved by the commission, as well as the commission's order directing compliance with its interpretation. *Id.* at 640. The Maryland commission argued that the district court did not have subject matter jurisdiction over the action because the interpretation and enforcement order was not the type of "determination" encompassed by the judicial review provision, § 252(e)(6), and because there was no cause of action for Verizon's claim. *See id.* at 641-42. The Supreme Court saw no need to decide whether an interpretation and enforcement decision was a "determination" within the meaning of § 252(e)(6) because, even if it were not, jurisdiction was available under § 1331: "[I]f § 252(e)(6) does not *confer* jurisdiction, it at least does

not *divest* the district courts of their authority under 28 U.S.C. § 1331 . . . ." *Id.* at 642.

In reaching this conclusion, the Supreme Court reasoned that because Verizon "seeks relief from the Commission's order on the ground that [the state] regulation is pre-empted by a federal statute," there was "no doubt" that Verizon's claim "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.* (quotation marks omitted). As to the effect of § 252(e)(6), the Supreme Court held that § 252(e)(6) "merely makes *some* . . . actions by state commissions reviewable in federal court," *id.* at 643, observing that the "mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). The Supreme Court noted that § 252(e)(6) "does not establish a distinctive review mechanism," and "does not distinctively limit the substantive relief available"; instead, § 252(e)(6) reads more like "conferral of a private right of action" than a limitation on the subject matter jurisdiction of the district court. *Id.* at 644; *see also Pac. Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003).

*Verizon Maryland* also rejected the argument that the federal district court did not have subject matter jurisdiction because there was no private cause of action to challenge the state commission's interpretation and enforcement order. Without reaching the question whether a private cause of action existed, the Court noted that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction." *Verizon Maryland*, 535 U.S. at 642-43 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).

Here, Western argues that § 207, which permits an individual damaged by a common carrier to "bring suit for the recovery of . . . damages," provides a private right of action to sue

an incumbent carrier for failure to negotiate in good faith as required by §§ 251 and 252 of the 1996 Act. If the court agrees with that interpretation of § 207 and Western prevails on the merits, Western may obtain relief; if not, it may not. Because the availability of relief turns on interpretation of a federal statute, we clearly have general federal question jurisdiction under § 1331. *See Steel Co.*, 523 U.S. at 89 ("[T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the . . . laws of the United States are given one construction, and will be defeated if they are given another.") (internal quotation marks omitted).

As in *Verizon*, the existence of § 252(e)(6), which provides for review of some state commission actions, does not affect this conclusion. Section 252(e)(6) does not provide a private right of action to sue other private entities for failure to negotiate in good faith. It is, rather, a judicial review provision, permitting actions against the *PUC* to determine whether its decisions are consistent with law.

**[2]** We so conclude from the language of § 252(e)(6) itself. Section 252(e)(6) is titled "Review of *State commission* actions" (emphasis added), and provides that "any party aggrieved" by the determination of a state PUC "may bring an action in an appropriate Federal district court to determine whether the agreement [approved by the PUC] . . . meets the requirements of section 251." The provision makes no reference to suit against any private party, and describes an action for "[r]eview" of whether the determination of the PUC is consistent with the "requirements" of the relevant law, in this case § 251.

**[3]** Other federal statutory provisions that allow individuals to petition for review of an agency's determination similarly provide for "review" of an "order" or "action" to ensure its consistency with the law, and do not make reference to a right to sue a private entity. *See, e.g.*, 5 U.S.C. §§ 702, 706(2)(A)

(permitting individuals "suffering legal wrong because of agency action . . . within the meaning of a relevant statute" to obtain "judicial review" of whether, among other things, the action was "in accordance with law"); 29 U.S.C. § 160(f) (providing that "[a]ny person aggrieved by a final order of the [National Labor Relations] Board granting or denying . . . the relief sought [with respect to a claim of unfair labor practices] may obtain a review of such order" in federal court); 15 U.S.C. § 78y(a)(1) ("A person aggrieved by a final order of the [Securities and Exchange Commission] . . . may obtain review of the order in the United States Court of Appeal"); *cf.* 42 U.S.C. § 2000e-5(f) (providing that after an investigation by the EEOC the "person aggrieved" may under certain circumstances bring a "civil action . . . against the respondent named in the charge," i.e., against a private party).[5] In such actions for judicial review, suit is against the agency itself or, in some cases, agency officials. *See, e.g.*, *East Bay Auto. Council v. N.L.R.B.*, 483 F.3d 628 (9th Cir. 2007) (action for judicial review of an N.L.R.B. order under 29 U.S.C. § 160(f)); *KPMG, LLP v. S.E.C.*, 289 F.3d 109 (D.C. Cir. 2002) (action for judicial review of a decision of the S.E.C. under 15 U.S.C. § 78y); 5 U.S.C. § 7703 (in a provision regarding "[j]udicial review of decisions of the Merit Systems Protection Board," specifying that "[t]he Board shall be named respondent in any proceeding brought pursuant to this subsection"); 5 U.S.C. § 703 (under APA, generally "the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer"). Thus, § 252(e)(6) allows Western to request that a district court review the substance of a determination by the PUC. It does not constitute a grant of a private right of action

---

[5]Many such judicial review provisions do not specify that the agency action shall be reviewed to determine whether it is consistent with the law, because the scope of review is instead found in the Administrative Procedure Act ("APA"). *See, e.g.*, *KPMG, LLP v. S.E.C.*, 289 F.3d 109, 121 (D.C. Cir. 2002) (applying APA standard of "arbitrary, capricious, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), to a determination by the S.E.C.).

against Qwest to enforce the duty to negotiate in good faith, and so does not affect our jurisdiction under § 1331 to determine the availability of a private cause of action under a different section of the Act.

**[4]** For similar reasons, it does not matter whether § 252(e)(6) contains an exhaustion or finality requirement and, if so, whether that requirement is jurisdictional.[6] Again, Western's action against Qwest is not an action for judicial review of a state commission determination; instead, Western has sued Qwest, a private party, for damages.[7] If Western were to request review of a state commission action before an

---

[6]The parties have referred to the "exhaustion" requirement in § 252(e)(6), but it may be more accurate to describe it as a type of finality requirement. Section 252(e)(6) requires that the PUC have made a "determination," but does not state that a party must exhaust every opportunity to raise its specific objections to the PUC before it raises them in district court. *See Darby v. Cisneros*, 509 U.S. 137, 144-45 (1993) (describing the differences between the doctrine of exhaustion of administrative remedies and the doctrine of finality). *See also AT&T Commc'n Sys. v. Pac. Bell*, 203 F.3d 1183, 1185-86 (9th Cir. 2000) (concluding that "Congress did not intend all state procedural requirements . . . be exhausted prior to judicial review by a district court" and holding that § 252(e)(6) requires only a "operational or binding" determination by the PUC). The distinction between finality and exhaustion requirements is sometimes significant for jurisdictional purposes. For example, in cases brought under the Administrative Procedure Act ("APA"), finality is a jurisdictional requirement, while some statutory exhaustion requirements may not be jurisdictional. *Compare Oregon Natural Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (observing that APA's finality requirement is jurisdictional) *with McBride Cotton and Cattle Corp. v. Veneman*, 290 F.3d 973, 980 (2002) (statutory exhaustion requirement was not jurisdictional). We need not determine, however, which type of requirement, if any, § 252(e)(6) imposes because, as the case now stands, Western is not bringing an action for judicial review of a PUC decision.

[7]As noted, Western's complaint did contain an action for judicial review of the PUC's substantive determinations about the consistency of the interconnection agreement with the § 251, but Western is not pursuing that cause of action on appeal. *See supra* at 8181, 8182 n.3. The complaint did not seek review of any PUC determination on the good faith issue, because no such determination had been made.

arbitration was complete, the statutory exhaustion or finality requirement contained in § 252(e)(6) might control.[8] But as Western has instead sued Qwest directly, and for damages, the exhaustion or finality requirement in § 252(e)(6) has no bearing on this court's subject matter jurisdiction. We thus have jurisdiction under 28 U.S.C. § 1331 to determine whether § 207 affords a private cause of action for enforcement of the good faith negotiation provisions in §§ 251 and 252, as well as whether there is a prudential requirement that the PUC first address such a claim.

## B.  Prudential Limits to Adjudication by the District Court.

[5] Although § 252(e)(6) does not deprive the district court of jurisdiction over Western's suit against Qwest or impose a finality or exhaustion requirement with respect to its good faith claim, there may nonetheless be prudential limits on the ability of Western to bring that claim. Western argues that § 207 provides a private right of action for damages against another carrier for failure to negotiate in good faith before the state commission, whether or not the issue is first raised before the state agency. We conclude — assuming for now that § 207 does provide a private cause of action for good faith claims — that prudential concerns require that Western present its good faith claim to the PUC before bringing suit in district court under § 207.

---

[8]Those requirements might nonetheless not be jurisdictional. The Supreme Court strongly suggested in *Verizon Maryland* that § 252(e)(6) is not a limit on the jurisdiction of the district court, even as to those actions for judicial review that come within its terms. *See Verizon Maryland*, 535 U.S. at 644 (noting that § 252(e)(6) reads more like a conferral of a private right of action for judicial review than a limitation on the subject matter jurisdiction of the district court); *see also McBride*, 290 F.3d at 980 (statutory exhaustion requirements are not jurisdictional unless they contain "sweeping and direct" language indicating that they limit the jurisdiction of district courts).

**[6]** As a preliminary matter, we note that, contrary to Western's contentions, nothing in the statute precludes a requirement that Western avail itself of its remedies before the state commission before suing Qwest under § 207. Section 207 does provide that an individual injured by a common carrier "may *either* make complaint to the Commission . . . or may bring suit . . . in any district court of the United States of competent jurisdiction." § 207 (emphasis added). But the Federal Communications Commission is the "Commission" referred to in § 207, not a state public utilities commission. *See* § 154(a) ("The Federal Communications Commission (in this chapter referred to as the 'Commission' "); § 153(41) ("The term 'State commission' means the commission . . . which under the laws of any State has regulatory jurisdiction with respect to intrastate operations of carriers."). Section 207 thus refers not to the ability to raise claims before a state public utilities commission, but to the procedures for bringing a complaint before the F.C.C. under § 208. *See* § 208 ("Complaints to Commission"). For this reason, the election of remedies provision in § 207 is not relevant to whether Western must bring its claims before the PUC before proceeding to *either* the F.C.C. or district court.

Once we have disposed of that contention quite easily, the issue we face becomes considerably more difficult. There are, it turns out, no precedents or doctrines that easily apply to the question before us. The reason, undoubtedly, is that Western's good faith claim arises in the context of an unusual — probably unique — statutory scheme, in which a state agency — here, the PUC — determines the provisions that must be incorporated in a private "agreement" between private parties, and does so by applying federal substantive law.[9] Western

---

[9]Another unusual aspect of the scheme is that, although the statute refers to the proceedings before the state agency as "arbitration," participation is compulsory, the parties do not choose the arbitrator, and the proceedings are not generally conducted in the manner of an arbitration. *See* § 252(b). In fact, the arbitrator essentially adjudicates the issues between

brought a good faith claim in district court, alleging that Qwest failed to negotiate in good faith during the process before the PUC because it drafted and submitted an interconnection agreement that did not comply with the arbitrator's order.

The PUC process provides a remedy for failure to negotiate in good faith during an arbitration. Under §§ 251 and 252, state commissions have the authority to impose conditions necessary to insure compliance with all of a local exchange carrier's obligations, including the obligation to negotiate in good faith. The 1996 Act defines refusal "to cooperate with the state commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission" as a failure to negotiate in good faith. § 252(b)(5). In conducting the arbitration, the state commission may "impos[e] appropriate conditions as required to" ensure that the requirements of § 251, which contains a local exchange carrier's good faith obligations, are met. *See* §§ 251(c)(1), 252(b)(4)(C). An F.C.C. regulation interpreting these provisions indicates that state commissions may make good faith determinations. *See* 47 C.F.R. § 51.301(c) ("If proven to the Commission, *an appropriate state commission*, or a court of competent jurisdiction,

the parties as would an administrative law judge, and the arbitrator's substantive rulings may be appealed to the state commission itself. *See* Or. Admin. R. 860-016-0030(1) (1998) (noting that "the Commission will use an ALJ as arbitrator"); *id*. (4) ("The arbitration will be conducted in a manner similar to a contested case proceeding, and the arbitrator will have the same authority to conduct the arbitration process as an ALJ has in conducting hearings under the Commission's rules."). An aspect of the proceedings that may, however, suggest an arbitration is the one that has created so much trouble here: after the arbitrator reaches a decision, a determination on the agreement is generally not made by the PUC until the parties themselves submit a signed agreement. § 252(e)(1) ("Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement . . . .").

the following actions or practices, among others, violate the duty to negotiate in good faith . . . .") (emphasis added)[10]; *see also In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499, 15571, 1996 WL 452885, at ¶ 143 (F.C.C. 1996) ("[W]e believe that state commissions have authority, under section 252(b)(5), to consider allegations that a party has failed to negotiate in good faith."). The practice of state commissions shows that they recognize that they have this authority and have acted on it. *See, e.g.*, *In re Petition for Arbitration of an Interconnection Agreement Between Sprint Communications Co. L.P. with Whidbey Tel. Co.*, No. UT-073031, 2008 WL 227939 (Wash. U.T.C. Jan. 24, 2008); *In re Beaver Creek Cooperative Tel. Co.*, No. 07-033, 2007 WL 385641 (Or. P.U.C. Jan. 29, 2007); *In re Sprint Communica-*tions, No. 961173-TP, 1997 WL 294619, at *8 (Fla. P.S.C. May 13, 1997).

Further, although Western maintains otherwise, the Oregon PUC has a specific procedure for raising the argument that Western has raised here — namely, that a draft interconnection agreement does not comply with the arbitrator's order. The PUC's rules provide that:

> Within 14 days after the [PUC] issues its arbitration decision, petitioner must prepare an interconnection agreement complying with the terms of the arbitration decision and serve it on Respondent. Respondent shall either sign and file the agreement, or file objections to it, within 10 days of service of it. If

---

[10]The F.C.C. regulation also recognizes that a "court of competent jurisdiction" may determine that a carrier failed to negotiate in good faith. This alternative does not affect our ultimate conclusion that the question must be decided by the PUC before bringing a good faith claim. The regulation does not directly address prudential concerns, such as exhaustion or primary jurisdiction, one way or the other. It is thus consistent with the conclusion that initial state commission adjudication is necessary for good faith claims.

> objections are filed, respondent shall state how the agreement fails to comply with the arbitration decision, and offer substitute language complying with the decision.

*See* Or. Admin. R. 860-016-0030(12) (1998). In this case, Western, rather than Qwest, was the "petitioner," because Western is the party that petitioned for arbitration. *See* § 252(b). It appears, however, that Western did not prepare an interconnection agreement as required by the rule, and that an agreement was instead drafted by Qwest. It is likely that the PUC would interpret its rules to permit whichever party did not draft the agreement to submit objections to it, but, even if that is not so, Western, as the "petitioner," could have drafted its own version of the agreement and submitted it to the PUC. In either case, then, PUC procedures would have permitted Western to make the PUC aware of its own interpretation of the arbitrator's order, and to explain why Qwest's version represented, in its view, a failure to negotiate in good faith.[11]

Moreover, Western could not only have received a response to its allegation that Qwest had failed to negotiate in good faith, but could have received at least some relief in the form of approval of an agreement consistent with the arbitrator's order.[12] As noted, Western could have submitted its own

---

[11]We do not decide whether insisting on contract provisions inconsistent with the arbitrator's order is a failure to negotiate in good faith. We observe only that F.C.C. regulations and Oregon procedures make evident that Western could have raised such an argument to the PUC and received an answer. *See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499, 16131, 1996 WL 452885, at ¶ 1293 (F.C.C. 1996) (explaining that "[a]bsent mutual agreement to different terms, the decision reached through arbitration is binding," and that "carrier might face penalties if, by refusing to enter into an arbitrated agreement, that carrier is deemed to have failed to negotiate in good faith").

[12]If the PUC does not "approve or reject a filed interconnection agreement within 30 days of its filing," the agreement will be "deemed

draft agreement. Had it done so, the PUC would have reviewed it for compliance with the arbitration order whether or not Qwest signed it — which is just what happened here, in reverse.[13]

Qwest sensibly argues that Western was required to seek these administrative remedies before the PUC in advance of bringing suit in district court under § 207. The unusual statutory scheme created in §§ 251 and 252, however, makes this case an uncomfortable fit for the prudential doctrines we usually apply to require that an agency decide an issue in the first instance.

As to exhaustion, in the absence of a statutory requirement, exhaustion of administrative remedies may be required as a prudential matter when policy factors favor it and it is not inconsistent with Congressional intent. *See Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003); *see also McGee v. United States*, 402 U.S. 479, 483-86 (1971). As a general rule, however, we have applied prudential exhaustion requirements in actions against agencies and agency officials, and

---

approved." *See* Or. Admin. R. 860-016-0030(12) (1998). Under those circumstances, it would be reasonable to construe the PUC's silence as a rejection on the merits of any good faith claims fairly presented to it. *Cf. Smith v. Digmon*, 434 U.S. 332, 333 (1978) (per curiam) (explaining that whether the habeas exhaustion requirement "has been satisfied cannot turn upon whether a state appellate court chooses to ignore . . . a federal constitutional claim squarely raised" by the petition).

[13]Other state commissions also sometimes approve interconnection agreements in the absence of participation by one party. *See In re Sprint Communications*, No. 961173-TP, 1997 WL 294619, at *8 (Fla. P.S.C. May 13, 1997) (concluding that one party had failed to negotiate in good faith by refusing to sign a negotiated agreement and therefore approving the proposed agreement of the other party as a final agreement); *Global Naps, Inc. v. Verizon New England, Inc.*, No. 03-10437, 2004 WL 1059792, at *3 (D. Mass. May 12, 2004) (noting that Global's refusal to sign the arbitrated agreement was a failure to negotiate in good faith for which the PUC's response of nonetheless enforcing that agreement was entirely appropriate), *aff'd*, 396 F.3d 16 (1st Cir. 2005).

not typically in actions between two private parties. *See, e.g.*, *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (applying prudential exhaustion requirement to habeas corpus petition based on denial of due process during removal proceedings); *Morrison-Knudsen Co, Inv. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1223 (9th Cir. 1987) (holding that on remand district court should consider whether prudential exhaustion required plaintiffs to exhaust their administrative remedies at the Federal Savings and Loan Insurance Corporation before bringing an action against that agency). That the doctrine of prudential exhaustion was crafted principally to channel actions against agencies and agency officials is reflected in the policy concerns that we have considered in applying it. For example, in deciding whether to require exhaustion, we consider the "agency's interest in . . . correcting its own errors" and "enjoying appropriate independence of decision." *See Morrison-Knudsen*, 811 F.2d at 1223; *Stratman v. Watt*, 656 F.2d 1321, 1326 (9th Cir. 1981)*; see also McGee*, 402 U.S. at 484. By bringing a private cause of action against Qwest contending that the agreement Qwest drafted does not comport with the PUC's order, Western has not brought a lawsuit challenging any "error" of the agency or otherwise directly attacking an agency decision.

As to a closely related doctrine, primary jurisdiction, we do apply that prudential doctrine in cases involving suits brought by a private party against another private party. *See, e.g.*, *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115-16 (9th Cir. 2008) (holding that an action by a telephone user against a cable operator was within the primary jurisdiction of the F.C.C.); *Davel Telecomm. v. Qwest Corp.*, 460 F.3d 1075, 1080, 1089 (9th Cir. 2006) (applying doctrine of primary jurisdiction in lawsuit between payphone service providers and Qwest Corp.). The primary jurisdiction doctrine is "a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Davel*, 460 F.3d at 1080 (inter-

nal quotation and emphasis omitted). We have applied the doctrine of primary jurisdiction when there is:

> (1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration.

*Clark*, 523 F.3d at 1115 (quoting *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002)).

The doctrine of primary jurisdiction, however, is also not a perfect fit for the statute before us. For one thing, the agency with "regulatory authority" in this context, in the sense of having the authority to promulgate substantive regulations, is the F.C.C., not the state commissions. *See* § 251(d)(1) ("[T]he Commission shall complete all actions necessary to establish regulations to implement the requirements of this section."); *United States v. Culliton*, 328 F.3d 1074, 1082 (9th Cir. 2003) (per curiam) (explaining that doctrine permits referral only to agency that "Congress has vested with the authority to regulate an industry or activity"). Also, we have questioned whether the doctrine permits referral of a case to a state, as opposed to a federal, agency. *See Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 n.12 (9th Cir. 1996) ("We note in passing that we are not entirely persuaded that the doctrine should be applied . . . to allow a federal court to 'route' issues to a state agency for resolution.").

**[7]** Still, while this statutory scheme is sufficiently unusual that the established contours of the exhaustion and primary jurisdiction doctrines do not quite apply, the basic concerns that underlie both doctrines have equal force here, as we shall shortly explain. We therefore agree with Qwest that the only sensible conclusion in this case, given the nature of Western's

asserted cause of action and the role allotted to state commissions by Congress, is that the PUC must address Western's good faith claim before that claim may be brought in district court. This requirement, it bears repeating, is a prudential limitation on adjudication, not a statutory or jurisdictional one. *See Laing v. Ashcroft*, 370 F.3d 994, 998 (9th Cir. 2004). We so hold for several reasons.

**[8]** *First*, while we might under other circumstances be hesitant to require that a party bring its claim to a state agency before raising a federal private right of action in district court, §§ 251 and 252 give the PUC a uniquely prominent role. In *Cost Management*, the plaintiffs brought a Sherman Act claim predicated in part on a violation of state law; our hesitation was based in part on our concern that the primary jurisdiction doctrine is "in effect, a power-allocating mechanism," and therefore that a "court must not employ the doctrine unless the particular division of power was intended by Congress." *See* 99 F.3d at 949 n.12 (quoting *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 n.13 (9th Cir. 1987)). Here, the federal statutory scheme specifically grants authority to a state agency to interpret and enforce the provisions of §§ 251 and 252 (as well as the regulations the F.C.C. promulgates to implement them), including the duty to interpret and enforce the obligation to negotiate in good faith. *See* § 252(b)(1), (e)(1)-(3).

**[9]** *Second*, although the structure of the § 207 cause of action for violation of the duty to negotiate in good faith — again, assuming that there is one — is unlike those in which we have applied exhaustion and primary jurisdiction in the past, many of the policy concerns that inform our application of those doctrines weigh heavily in favor of PUC adjudication in the first instance. In both contexts, we have considered the importance of deferring to and relying on agency "expertise." *See Clark*, 523 F.3d at 1115; *Gonzales v. Dept. of Homeland Sec.*, 508 F.3d 1227, 1234 (9th Cir. 2007). Here, Western primarily challenges Qwest's compliance with the arbitrator's

order. The PUC is certainly "expert" in the meaning of its own orders, and its assessment of Qwest's compliance would greatly aid the district court. The PUC also has a particular expertise in this case: The lack of good faith negotiation alleged occurred during proceedings before the agency, making the agency a witness to the actions about which Western complains. The agency is thus much better situated than the district court to "mak[e] a proper record" and determine the facts surrounding the alleged failure to negotiate in good faith. *See Morrison-Knudsen*, 811 F.2d at 1223.

[10] *Third*, failure to require Western to await an agency decision in this case would permit an extremely inefficient "bypass of an administrative remedy." *Gonzales*, 508 F.3d at 1234. The unusual two-step procedure required by the statute, in which a state commission first arbitrates an agreement and then approves it after it is submitted by the parties, made it possible for Western to request binding arbitration and then wait and see whether the PUC would decide the substantive issues in its favor. Only when the PUC did not did Western abandon the arbitration and head to district court, rather than either submitting its own version of the agreement or raising objections to Qwest's version.[14] Such behavior wastes the agency's resources and makes it more difficult for the district court to reach a correct decision on the good faith claim.

---

[14]It is not clear that such deliberate bypass of the administrative scheme is likely to recur frequently. Requesting carriers, such as Western, presumably wish to enter into interconnection agreements with incumbent carriers like Qwest, and it is not clear that Western gains any advantage in the interim by delaying adoption of an agreement, even an imperfect one. In fact, it is more likely that incumbent carriers, such as Qwest, have an incentive to delay adoption of an interconnection agreement after arbitration, because they may prefer not to provide interconnection for as long as possible. Nonetheless, there are at least two other cases pending before this court in which Western appears to have headed directly to district court with its good faith claim, rather than waiting for the PUC to approve or reject an agreement. *See Autotel v. Qwest Corp.*, No. 07-17112; *Autotel v. Central Telephone Co.*, No. 06-16565.

**[11]** *Fourth*, imposition of a requirement that Western await a decision on the issue from the PUC is not only not inconsistent with the statutory scheme, but comports with Congressional intent insofar as it can be ascertained. Sections 251 and 252 establish a detailed structure for negotiation and imposition of interconnection agreements. They provide that a request for binding arbitration before a state commission may be made "[d]uring the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for [voluntary] negotiation." § 252(b). The Act also specifies what information must be provided in a petition to a state commission requesting arbitration, § 252(b)(2), and requires that the "non-petitioning party" be provided an "[o]pportunity to respond." § 252(b)(3). The Act goes on to lay out the duties and powers of a state commission during arbitration, the standards the state commission must apply, and the schedule on which the state commission must decide to approve or reject an agreement. *See* § 252(b), (c), and (e). The inclusion of a judicial review provision in the same statutory section describing the administrative proceedings, *see* § 252(e)(6), even though it does not provide the cause of action for Western's good faith damages claim against Qwest, further suggests that Congress expected administrative proceedings generally to come to a close before institution of proceedings in a district court. Section 252 nowhere suggests that at any point prior to a PUC determination a carrier may turn to a district court and sue another carrier if aggrieved by the actions of that carrier. It can hardly be expected that Congress created such a complex scheme of administrative arbitration if it anticipated that parties would regularly bypass that scheme and head directly to district court.

**[12]** *Finally*, our conclusion is consistent with the general principle that we attempt to strike a balance between the rights of parties to bring their private causes of action in federal court and a statutory scheme providing an alternative means of resolution before an agency. In the context of the

Railway Labor Act ("RLA") and the National Labor Relations Act ("NLRA"), for example, courts have held that certain claims must be decided by the agency in the first instance, despite the fact that the statute nowhere explicitly states that the agency has exclusive jurisdiction over those claims.[15] *See, e.g.*, *Konop v. Haw. Airlines, Inc.*, 302 F.3d 868, 881 (9th Cir. 2002) (noting that, under RLA, "controversies over the meaning of an existing collective bargaining agreement must be arbitrated" through the agency scheme established in 45 U.S.C. §§ 151a, 152); *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 187-88 (1978) (holding that both state and federal courts must defer to the National Labor Relations Board when an activity is arguably protected under § 7 or prohibited by § 8 of the NLRA); *see generally Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1357 (9th Cir. 1978). Here, Congress has established a complex arbitration scheme administered by a state agency that provides some potential remedy for the actions about which Western complains. It is appropriate to require that Western complete the arbitration process it has already begun and obtain a decision on the questions underlying its good faith claim before it brings its good faith claim in district court. Applying the requirement that the agency initially address the good faith question, we observe that the PUC has

---

[15]The analogy to the RLA and the NLRA is not perfect. In both cases, courts have held that the jurisdiction of the agency over certain issues is "exclusive," *see Konop*, 302 F.3d at 881; *Sears*, 436 U.S. at 187-88, and the Supreme Court has acknowledged that this distinguishes the primary jurisdiction doctrine in the context of the NLRA from the usual doctrine of primary jurisdiction, *see Sears*, 436 U.S. at 200 n.29 (noting that the use of "primary jurisdiction" in the NLRA context should not be confused with the usual notion of primary jurisdiction, in which the court decides only that the agency must *initially* address an issue, not that the court has no authority to decide the issue). Nonetheless, although we do not hold that agency jurisdiction is exclusive, the RLA and NLRA examples demonstrate that in balancing the rights of parties immediately to raise a claim in district court against agency authority to adjudicate an issue in the first instance, we may conclude that the intent of Congress is best served by requiring agency adjudication.

now approved an interconnection agreement. In its October 10, 2005 decision approving the agreement submitted by Qwest, the PUC held that "the interconnection agreement submitted by Qwest . . . complies with" the arbitrator's decision.

**[13]** It is possible that this decision satisfied any prudential requirement that Western pursue its complaint with the PUC before filing suit. Ordinarily, when an agency has actually addressed an issue, the policies underlying the exhaustion doctrine (and, we would think, the primary jurisdiction doctrine) are satisfied, and a party need not return to the agency to raise it. *See Abebe v. Gonzales*, 432 F.3d 1037, 1041 (9th Cir. 2005) (en banc) (when agency has actually considered and decided an issue, the issue is exhausted despite the petitioners' failure to raise it before the agency). For two reasons, however, we cannot be sure that the prudential requirement we impose with regard to any § 207 lack of good faith negotiation cause of action has been met.

First, at oral argument, Western suggested that its "good faith" claim was based not only on the actions of Qwest in failing to draft an agreement that complied with the arbitrator's order but also on Qwest's actions throughout negotiations. As far as we can determine, Western's complaint makes reference only to Qwest's failure to draft a compliant agreement, and does not specify any other facts or actions that would support a good faith claim. But, until Western spells out the full scope of its good faith claims in more detail and either explains why they are encompassed in the existing complaint or amends its complaint, it will not be possible to determine the degree to which the prudential requirement we have recognized was met by the PUC's approval of the agreement submitted by Qwest.

Second, it is not clear on what basis, if any, the PUC decided the noncompliance issues that Western wishes to adjudicate. On the one hand, the PUC's ruling that Qwest's agreement complies with the arbitrator's order may constitute

a decision that Qwest did negotiate in good faith. On the other hand, the PUC order suggests that, after the arbitrator has issued a decision, acceptance of an agreement that is consistent with that decision is compulsory. The PUC's order can be read to imply that there are no "negotiations" after the arbitrator's decision, and to suggest that one cannot violate the duty to negotiate in good faith after the arbitrator's decision, even if one submits an agreement that is not consistent with the arbitrator's order. It is thus not entirely clear, without further inquiry, what the PUC's position is on whether Qwest's alleged actions constitute a failure to negotiate in good faith.

**[14]** At the time the district court issued its decision, there had been no PUC order approving an interconnection agreement. The district court therefore had no opportunity to address the impact of that order on this litigation, including answering the questions we have just posed. We thus remand to the district court to permit it to determine whether the PUC has decided the good faith questions Western seeks to litigate, as well as the ultimate effect of the PUC's decision on the current litigation. *See Golden Gate Hotel Ass'n v. City and County of San Francisco*, 18 F.3d 1482, 1487 (9th Cir. 1994) ("As a general rule 'a federal appellate court does not consider an issue not passed upon below.' ") (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).

If the district court concludes that Western's good faith claims were determined, impliedly or expressly, by the PUC, it will remain to decide whether a party may bring a good faith claim under § 207. This question was not addressed by the district court, likely because it was not clearly raised by the parties.[16]

---

[16]In its complaint, Western alleged that the district court had "jurisdiction" over this action under "42 [sic] U.S.C. § 207." The effect of § 207 was not briefed by either party below, and the district court did not mention § 207 in its decision.

Although the question is a complex one, two of Qwest's arguments may be disposed of easily. Qwest suggests that § 207 does not permit private actions to enforce provisions of the 1996 Act, as opposed to the 1934 Act, and maintains that § 207 only permits actions by *customers* against common carriers. Qwest's first argument is inconsistent with the purpose and function of the 1996 Act. The Supreme Court has stated that "the 1996 Act was adopted, not as a freestanding enactment, but as an amendment to, and hence part of" the 1934 Act. *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 386 (1999). Further, in *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 127 S.Ct. 1513 (2007), the Supreme Court held that the cause of action contained in § 207 was available to enforce an F.C.C. regulation promulgated under 47 U.S.C. § 276(b)(1), a section added by the 1996 Act. *See id.* at 1519-20; *see also Valdes v. Qwest Comm'ns Int'l, Inc.*, 147 F. Supp. 2d 116 (D. Conn. 2001) (jurisdiction available under § 207 for customers to enforce "no slamming" provision of the 1996 Act).

*Global Communications* also disposes of Qwest's second argument. In that case, the plaintiffs were not customers but payphone operators suing to enforce an F.C.C. regulation mandating the level of payment long distance carriers were to provide them. 127 S. Ct. at 1515. The Court explicitly rejected the argument that § 207 only permitted actions by customers and not by fellow carriers. *See id.* at 1524.

Nonetheless, the remaining issues regarding the applicability of § 207 are complex and should not be decided without the participation of the F.C.C., the agency principally responsible for the enforcement of the Telecommunications Act. Whether § 207 provides a cause of action may, in fact, have an impact on F.C.C. regulation in other contexts. For example, determining whether § 207 provides a private right of action for Western's claim may involve interpreting the relationship between the terms "common carrier," "local exchange carrier," and "telecommunications carrier." Section

207 refers to damages caused by a "common carrier." Qwest's duty to negotiate in good faith, however, arises from its obligations as a "local exchange carrier." *See* § 251(c)(1) ("each incumbent local exchange carrier has . . . [t]he duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of" interconnection agreements).

The relationship between these two terms is not obvious. On the one hand, the statutory definitions and the use of the terms in other provisions of the Acts suggest that local exchange carriers are not necessarily a subset of common carriers. *See, e.g.*, § 153(10) (definition of common carrier); § 153(26) (definition of local exchange carrier); § 228(d)(3), (g)(1) (discussing common carriers and local exchange carriers as distinct categories of entities). On the other hand, the statutory definition of "telecommunications carrier" — a term which is used along with "local exchange carrier" in § 252 — as well as F.C.C. guidance on the relationship between common carriers and telecommunications carriers, suggests that local exchange carriers may be common carriers for purposes of § 207. *See* § 153(44) (definition of telecommunications carrier); *In the Matter of AT&T Submarine Systems, Inc.*, 13 F.C.C.R. 21585, 21587-88 (F.C.C. 1998) (holding that "the term 'telecommunications carrier' means essentially the same as [sic] common carrier"). As all three terms are frequently used throughout the telecommunications acts, interpreting them may have consequences in areas of telecommunications law other than the reach of § 207.

In addition, interpretation of § 207 potentially implicates the jurisdiction of the F.C.C. Section 207 offers aggrieved individuals a choice of remedies for alleged violations of the Telecommunications Act: they may go to the F.C.C., presumably by bringing a complaint under § 208 — which provides a mechanism for filing complaints before the F.C.C. — or to a district court. Given that the statute provides a choice between these two remedies, it may be logical to expect that

if a claim can be brought in district court under § 207, it also may be brought to the F.C.C. under § 208. On the other hand, the F.C.C. has never directly decided whether it has jurisdiction over good faith claims such as Western's.[17]

In sum, these questions of statutory interpretation are both open and significant. *See generally Alexander v. Sandoval*, 532 U.S. 275, 286-89 (2001) (discussing private right of action analysis). For a court to attempt to decide them "without the views of the agenc[y] responsible . . . would be to embark upon a voyage without a compass." *Mead Corp. v. Tilley*, 490 U.S. 714, 726 (1989). Consequently, if it determines that the question of the reach of § 207 with regard to good faith causes of action must be decided, we suggest that the district court seek the opinion of the F.C.C. as an invited amicus curiae. *See Mead Corp.*, 490 U.S. at 726 (remanding to the lower court with instructions to consider the views of the agency because the issue had not been decided below and the agency had up to that point not offered its views on the question); *Beck v. Pace Intern. Union*, 127 S. Ct. 2310, 2317 (2007) (deferring to views of the Pension Benefit Guaranty Corporation provided in an amicus brief).

## II. Section 1983 Claims.

In dismissing Western's 42 U.S.C. § 1983 claims against the PUC and its Commissioners, the district court stated only that "the PUC's well founded motion to dismiss is denied with leave to renew upon this court obtaining proper jurisdiction over this matter." Although the district court's holding could be clearer, it appears to have concluded that the § 1983

---

[17]Although 47 C.F.R. § 51.301(c) does provide that certain actions will "violate the duty to negotiate in good faith" if they are "proven to the [F.C.C.]," it is not clear whether this provision applies only when the F.C.C. preempts a state commission's jurisdiction and "assumes [its] responsibility" with respect to an ongoing proceeding or matter. *See* 47 U.S.C. § 252(e)(5).

claims were not ripe for adjudication in the absence of final agency action. We do not decide whether the district court was correct in that regard.

Instead, we observe only that ripeness is assessed based on the facts as they exist at the present moment. *See Assiniboine and Sioux Tribes v. Bd. of Oil and Gas Conservation*, 792 F.2d 782, 788 & n.3 (9th Cir. 1986) ("Because ripeness is 'peculiarly a question of timing,' we look to the facts as they exist today in evaluating whether the controversy before us is sufficiently concrete"); *see also Buckley v. Valeo*, 424 U.S. 1, 114-17 (1976) (reversing Court of Appeals decision that certain claims were not ripe because, in the interim between the Court of Appeal's decision and Supreme Court consideration of the case, agency action had been taken, making the claims ripe for review); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 139-40 (1974) (reversing lower court holding that case was not ripe for review because "[i]t is the situation now rather than the situation at the time of the district court's decision that must govern").

As we have already noted, since the district court decision, the PUC has issued an order approving the interconnection agreement submitted by Qwest, and Western Radio is now bound by the conditions of that agreement. It may well be that this development would alter the district court's ruling on whether the § 1983 cause of action is sufficiently ripe to go forward. We therefore remand to the district court for further proceedings on this cause of action as well.

## CONCLUSION

For the foregoing reasons, the decision of the district court is **VACATED** and **REMANDED** for further proceedings not inconsistent with this opinion.