**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN RADIO SERVICES CO.,
          *Plaintiff-Appellant,*

          v.

QWEST CORPORATION, a Colorado
Corporation; PUBLIC UTILITY
COMMISSION of OREGON; LEE
BEYER, Chairman; RAY BAUM,
Commissioner; JOHN SAVAGE,
Commissioner,
          *Defendants-Appellees.*

No. 10-35820

D.C. No.
6:05-cv-00159-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
October 12, 2011—Portland, Oregon

Filed March 15, 2012

Before: David M. Ebel,* Marsha S. Berzon, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Ebel

---

*The Honorable David M. Ebel, Senior Circuit Judge for the United
States Court of Appeals for the Tenth Circuit, sitting by designation.

## COUNSEL

Marianne Dugan, Eugene, Oregon, for the plaintiff-appellant.

Gregory Monson, Stoel Rives LLP, Salt Lake City, Utah; Judy C. Lucas and Michael T. Weirich, Oregon Department of Justice, Salem, Oregon, for the defendants-appellees.

## OPINION

EBEL, Circuit Judge:

This case arises out of a dispute between two telecommunications carriers over their interconnection agreement ("ICA"[1]) under the Telecommunications Act of 1996. Plaintiff-Appellant Western Radio Services Company ("Western") is a commercial mobile radio service ("CMRS") provider. Defendant-Appellee Qwest Corporation ("Qwest")

---

[1]A list of frequently used acronyms is contained in the Appendix at the end of this opinion.

is a local exchange carrier ("LEC"). Western appeals two decisions of the district court: first, its decision dismissing Western's claim against Qwest for Qwest's alleged violation of its statutory duty to negotiate the ICA in good faith; and second, its decision affirming the orders of Defendant-Appellee the Oregon Public Utility Commission ("PUC"), which adopted the results of the arbitration leading to the ICA and approved the ICA. This Court has jurisdiction under 28 U.S.C. § 1291.

Regarding the good faith claim, we conclude that Western has failed to exhaust the prudential requirement that it first present that claim to the PUC before bringing that claim in federal court. Accordingly, we AFFIRM the district court's decision dismissing that claim.

Regarding the challenge to the approval of the ICA, we conclude that the ICA's provisions (1) requiring Western to interconnect with Qwest's network via at least one point per Local Access and Transport Area ("LATA"); and (2) providing Western with the signaling systems of its choice only where such systems are available, do not violate the Act. However, we also conclude that the ICA, as approved, does violate the Act insofar as it applies access charges, rather than reciprocal compensation, to calls exchanged between a CMRS provider and a LEC, originating and terminating in the same LATA, when those calls are carried by an interexchange carrier ("IXC").[2] Accordingly, we REVERSE the district court's decision upholding the PUC's approval of the ICA to that extent, and REMAND to the PUC for further proceedings not inconsistent with this opinion.

---

[2]An IXC is a long-distance carrier. *See Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n.*, 490 F.3d 619, 621 (8th Cir. 2007).

BACKGROUND

I.  The regulatory regime

Congress enacted the Telecommunications Act of 1996, amending the Communications Act of 1934 (collectively, the "Act"), to promote competition in the provision of telecommunications services to consumers—services historically provided by state-sanctioned monopolies. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). The Act imposes on incumbent LECs ("ILECs")—carriers that have historically held monopolies in an area—the duty to provide interconnection with the facilities and equipment of competing telecommunications carriers, and, upon request, to negotiate "in good faith" the terms and conditions of agreements governing such interconnection. *Id.* at 371-73; 47 U.S.C. § 251(a), (c)(1). Where carriers cannot reach an agreement, they may ask the relevant state public utilities commission to mediate their differences or to provide binding arbitration. 47 U.S.C. § 252(a)(2), (b)(1).

In arbitrating the dispute, the state commission must ensure that the resulting ICA meets the requirements of Sections 251 and 252 of the Act, and must establish "just," "reasonable," and "nondiscriminatory" rates for services and a schedule for implementation. *Id.* § 252(c)-(d). Following arbitration, the state commission must then formally approve the resulting ICA, unless the state commission finds, among other things, that it violates Section 251 of the Act, or its implementing regulations, or the pricing standards of Section 252 of the Act. *Id.* § 252(e)(1), (e)(2)(B). Any party aggrieved by the state commission's action may seek judicial review in an appropriate federal district court "to determine whether the agreement . . . meets the requirements of section[s 251 and 252 of the Act]." *Id.* § 252(e)(6).

In addition, Sections 206 and 207 of the Act provide that a "common carrier" shall be liable for any damages resulting

from its violation of the Act, and that such damages may be recovered either by filing a complaint with the Federal Communications Commission ("FCC") or by filing suit in a district court of competent jurisdiction. *See id.* §§ 206, 207. A common carrier is "any person engaged as a common carrier for hire, in interstate . . . communication by wire or radio." *Id.* § 153(11). This court has previously observed that the relationship between the terms "local exchange carrier" and "common carrier" is not clear, but it appears that a LEC may also be a common carrier for purposes of Section 207. *See W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1204 (9th Cir. 2008).

## II.   The parties and prior proceedings

Western is an Oregon-based wireless communications provider licensed by the FCC to provide CMRS in Oregon. ILEC Qwest is authorized by the state of Oregon to provide wireline services in Oregon. Both are "telecommunications carriers" governed by the Act. *See* 47 U.S.C. §§ 152(a); 153(51). However, Western is not licensed to provide wireline services in Oregon and is thus not a "LEC" within the meaning of the Act. Western has been doing business with Qwest, or Qwest's predecessor, U.S. West Communications, since before the Act was passed.

The instant dispute arises out of an ICA between Qwest and Western, arbitrated by the PUC in 2004 and approved by the PUC in 2005. Western initiated negotiations with Qwest in October 2003. No ICA ensued, and in March 2004 Western petitioned the PUC for arbitration. The PUC arbitrator resolved twelve open issues and filed his decision with the PUC on September 20, 2004. Western filed objections to the arbitrator's decision on October 1, 2004. Rejecting Western's objections, the PUC adopted the arbitrator's decision in its entirety and ordered Qwest and Western to submit for approval, within thirty days, an ICA that complied with the terms of the arbitrator's decision ("the 2004 PUC order").

Qwest timely submitted a proposed agreement to the PUC. Western had not at that point reviewed or signed the proposed agreement, though Qwest had sent Western a copy eight days earlier. However, Qwest represented to the PUC that it believed its proposed agreement was "fully compliant with the Order" and invited the PUC to approve the agreement if appropriate. SER 227. About two weeks later, Western reviewed the proposed ICA and found aspects to which it objected. Western notified Qwest of these problems but did not file any objections with the PUC.

Instead, in February 2005, after the PUC had adopted the arbitrator's findings, but before it had approved Qwest's proposed ICA, Western sued the PUC, its commissioners in their official capacities, and Qwest in the District of Oregon, claiming that (1) Qwest had failed to negotiate in good faith as required by Section 251(c)(1) of the Act, and (2) the PUC had violated its duties under the Act when it adopted the arbitrator's decision.[3] The district court dismissed both claims in July 2005 for lack of subject matter jurisdiction, because the PUC had not yet taken any final action to approve or reject the ICA, and because Western had not presented its good faith claim to the PUC for adjudication. Western appealed the dismissal of the good faith claim to this Court ("the first appeal"), which held that the district court would have subject matter jurisdiction to determine whether a private right of action existed for a good faith claim under Section 207 of the Act—but that even if such a private right of action existed, for prudential reasons "the PUC must address Western's good faith claim before that claim may be brought in district court." *W. Radio Servs. Co.*, 530 F.3d at 1200. This Court emphasized that this requirement was prudential, as opposed to statutory or jurisdictional. *Id.*

---

[3]In its initial lawsuit, Western also raised claims against the PUC under 42 U.S.C. § 1983, but those claims were dismissed, were not appealed, and are not at issue here.

Meanwhile, on October 10, 2005, while the first appeal was pending, the PUC approved Qwest's proposed ICA, finding it complied with the Act's requirements ("the 2005 PUC order"). Five days later Western filed a new petition for arbitration, which the PUC eventually dismissed as improper ("the 2006 PUC order"). Observing that this had transpired, this Court instructed the district court to consider whether the 2005 PUC order satisfied the prudential "requirement that the PUC first address [Western's] . . . good faith claim," and, if so, to determine whether a private right of action existed under the Act for violation of the duty to negotiate in good faith. *W. Radio Servs. Co.*, 530 F.3d at 1193.

On remand from the first appeal, the district court examined the 2005 and 2006 PUC orders. *W. Radio Servs. Co. v. Qwest Corp.*, Civ. No. 05-159-AA, 2009 WL 1312425, at *5-7 (D. Or. May 5, 2009). The district court determined that neither order addressed any type of "good faith" claim. *Id.* Therefore the district court again dismissed Western's good faith claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id.* at *4, *7. In a second proceeding, after additional briefing on the remaining issue of whether the approved ICA complied with the Act, the district court affirmed the PUC's orders adopting the arbitrator's decision and approving the ICA prepared by Qwest. *W. Radio Servs. Co. v. Qwest Corp.*, 734 F. Supp. 2d 1139 (D. Or. 2010). This appeal followed, challenging both of those decisions.

## DISCUSSION

### I.  Standard of Review

This court reviews de novo a dismissal under Rule 12(b)(6). *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030 (9th Cir. 2008). In doing so, this Court may "generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Id.* at 1030-31 (quoting *Outdoor*

*Media Gp., Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007) (internal quotation marks omitted)). All well-pleaded factual allegations are taken as true and viewed in the light most favorable to the non-moving party. *Id.* at 1031.

Likewise, we review de novo whether an arbitrated, approved ICA complies with the requirements of the Act and its implementing regulations. *U.S. W. Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 (9th Cir. 2002). We review all other issues, including the state commission's factual findings, under an arbitrary and capricious standard. *Id.* The PUC's decision is "arbitrary and capricious if the decision 'was not supported by substantial evidence,' or the commission made a 'clear error of judgment.' " *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1150 (9th Cir. 2006) (quoting *Pac. Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1131 (9th Cir. 2003)). Importantly for purposes of this appeal, we do not pass upon the validity of any relevant FCC regulations. *See* 28 U.S.C. §§ 2342, 2344 (requiring original petition challenging FCC final orders to be brought in court of appeals); *see also Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n*, 621 F.3d 836, 843 (9th Cir. 2010) ("The parties may not challenge the validity of any . . . FCC regulations[ ] in this action."); *Jennings*, 304 F.3d at 958 n.2 ("Properly promulgated FCC regulations currently in effect must be presumed valid for the purposes of this appeal. . . . [N]o question as to their validity can be before us in this appeal.").

## II.   Good Faith Claim

We held in the first appeal that the district court would have subject matter jurisdiction over a good faith claim against a private party (assuming such a private right of action existed under the Act), but that even if such a cause of action existed, for prudential reasons "the PUC must address Western's good faith claim before that claim may be brought in district court." *W. Radio Servs. Co.*, 530 F.3d at 1200. We remanded for a determination of whether that prudential

requirement had been met, and, if so, for a determination of whether the Act provided a cause of action against a private party for violation of the duty to negotiate in good faith. *Id.* at 1193.

On remand, the district court focused on the PUC's October 10, 2005 order approving the ICA and the PUC's January 3, 2006 order dismissing Western's post-approval petition for arbitration. The district court first found that the October 2005 order approving the ICA never discussed a good faith claim. The district court also found that, subsequent to this Court's 2008 decision and remand, Western had failed to present a good faith claim to the PUC for adjudication. The district court further found that the 2006 order dismissing Western's post-approval petition for arbitration was also not a "substantive determination of Western's good faith claim . . . ." *W. Radio Servs. Co.*, 2009 WL 1312425, at *7. Because the PUC "neither expressly nor impliedly addressed Western's good faith claims," and Western's efforts were "insufficient to comply with the prudential concerns discussed in the Ninth Circuit's mandate," the district court dismissed the good faith claim. *Id.* at *5, *7.

In its second appeal, now before us, Western argues that, although the PUC never addressed its good faith claim, Western "squarely" submitted a good faith claim to the PUC in its October 2005 petition. Western Opening Br. at 15. The PUC responds that, even if Western's October 2005 petition presented a good faith claim, "the PUC did not have the opportunity to address the claim on its merits . . . because the approved [ICA] was already in effect." PUC Br. at 7.

It is clear that the state commission did not expressly rule on Western's good faith claim. Similarly, we conclude that the PUC did not implicitly rule on Western's good faith claim when it approved the ICA, because Western's good faith claim was never properly put at issue in the proceedings before the PUC. Therefore, Western has not satisfied the pru-

dential requirement established in *W. Radio Servs. Co.*, 530 F.3d at 1200, and may not bring this claim now in federal court.

A.   Statutory requirements for arbitrations

**[1]** The duty to negotiate in good faith is imposed upon both parties by Section 251(c)(1) of the Act. A refusal to negotiate during arbitration, or to cooperate with the arbitrator, is considered a failure to negotiate in good faith. 47 U.S.C. § 252(b)(5). Regulations promulgated by the FCC identify other failures to negotiate in good faith, including but not limited to demanding a nondisclosure agreement; demanding that the other party attest that the ICA complies with the Act; refusing to include terms permitting future amendment of the ICA; and intentionally obstructing or delaying negotiations or resolutions of disputes. *See* 47 C.F.R. § 51.301(c).

If a party's failure to negotiate in good faith is an "open issue[ ]" in arbitration proceedings before the state commission, Section 252(b) of the Act requires the state commission to rule upon it. *See* 47 U.S.C. § 252(b)(1) ("[A] party . . . may petition a State commission to arbitrate any open issues."); *id.* § 252(b)(2)(A)(i) ("A party that petitions a State commission . . . shall . . . provide the State commission all relevant documentation concerning . . . the unresolved issues . . . ."); *id.* § 252(b)(4)(C) ("The State commission shall resolve each issue set forth in the petition and the response, if any . . . ."). Further, a commission may *reject* an arbitrated ICA *only* if it finds that the ICA does not comply with Section 251, which includes the duty to negotiate in good faith, or the pricing standards of Section 252. *Id.* § 252(e)(2)(B).

**[2]** The Act provides a strict window of time for the submission of a petition for arbitration: "the 135th to the 160th day (inclusive) after the date on which [a carrier] receives a request for negotiation under this section. . . ." *Id.* § 252(b)(1).

In other words, a carrier may not petition the PUC for arbitration until 135 days after it has received a qualifying "request for negotiation." This is true whether the party seeking arbitration is an ILEC or a competing CMRS. *See* 47 C.F.R. § 20.11(e).

B.    Western's two petitions for arbitration

In this case, Western petitioned the PUC for arbitration twice. The first petition, on March 11, 2004, properly followed Western's October 2003 request to Qwest to open negotiations. That first petition led to the arbitration that culminated in the PUC's October 10, 2005 order approving the ICA that is before us now. The second petition, filed on or about October 15, 2005,[4] purported to relate to a new "request for negotiation" that Western claimed to have received from Qwest in May 2005, yet in substance it raised issues relating to the just-approved ICA. The PUC summarily dismissed this second petition for two reasons. First, the PUC concluded that the existence of the newly approved ICA prevented it from reaching the merits of any subsequent petition related to that ICA. Second, the PUC dismissed this second petition as improper on statutory grounds, finding that Western had received no new "request for negotiation" sufficient to trigger a second entitlement to request arbitration.

C.    Neither petition sufficed to put the good faith issue before the PUC

In the first petition and ensuing arbitration, Qwest's good faith was never identified as an "open issue[ ]" that required the PUC's resolution under 47 U.S.C. § 252. Nor did the PUC

---

[4]The copy of the second petition in the record is dated October 15, 2005. However, the PUC order dismissing the petition states that the petition was filed on October 14, 2005. This discrepancy is immaterial; the key fact is that the petition was filed *after* the PUC's October 10, 2005 order approving the ICA.

"reject" the proposed ICA pursuant to 47 U.S.C. § 252(e)(2)(B). Accordingly, there is no basis for concluding that the PUC implicitly ruled on the issue of Qwest's good faith when it approved the ICA.

[3] Before this Court, Western relies solely on its second, post-approval petition to support its contention that it "submitted the good faith claim squarely to the PUC." Western Opening Br. at 15. Western argues that the PUC refused to address its claim, thus any further presentations would have been futile, thus Western should be permitted to sue in district court. But we conclude that Western may not rely on this second petition to support its claim. As is apparent from the PUC's two alternative grounds for dismissing the second petition, it was not clear whether Western sought to reopen arbitration of the already-approved ICA or whether Western sought to start over again from scratch. If the former, Western's argument fails because the PUC's ability to address a good faith claim ended when it approved the ICA. Any good faith claim pertaining to those negotiations and not already raised would be barred because a party's window for raising that claim would have closed. If the latter, Western's argument fails because Western was statutorily unable to petition the PUC for arbitration until 135 days after it had received a qualifying "request for negotiation." The PUC's finding that there had been no new "request for negotiation" was supported by substantial evidence in the record that Qwest had not requested another negotiation.[5] The PUC's dismissal of

---

[5]By its terms the second petition purported to relate to a "request for negotiation" from Qwest, dated May 4, 2005, and received by Western on May 10, 2005, nearly seven months after the PUC had already adopted the arbitrator's recommendations, and nearly six months after Qwest had submitted a proposed ICA to the PUC for approval. That May 4 letter, however, was a form letter sent by Qwest to all wireless carriers, relating to interim tariff measures, in response to a recent ruling of the FCC.

At oral argument, Appellant's counsel argued that Qwest's May 4 letter related to the present dispute. Counsel for Appellees maintained that the May 4 letter was entirely separate from this dispute, and the Court agrees.

the second petition in no way represented a ruling on any good faith claim related to the approved ICA. Accordingly, Western may not rely on the second petition as evidence that it presented a good faith claim to the PUC.

Western argues that it "presented its good faith claim to the PUC as best it could," *id.* at 19, and that any procedural defects "should be overlooked" because Western "appeared before the [PUC] *pro se*." *Id.* at 18. Before this Court, however, Western was represented by counsel and it still could not point to any other place in the record demonstrating that it adequately presented this claim to the PUC. We will not do an appellant's work for it, either by manufacturing its legal arguments, or by combing the record on its behalf for factual support. *See Guatay Christian Fellowship v. Cnty. of San Diego*, ___ F.3d ___, 2011 WL 6450742, at * 26 (9th Cir. Dec. 23, 2011) (citing *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)) (rejecting assertion unsupported by "argument or legal authority"); *Christian Legal Soc'y v. Wu*, 626 F.3d 483, 487-88 (9th Cir. 2010) (refusing to address appellant's argument, finding it unsupported "even after assiduously digging through [appellant's] opening brief, and carefully reviewing" those portions of the record specifically relied upon by the appellant); Fed. R. App. P. 28(a)(9)(A) (requiring appellant's opening brief to contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *cf. United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived."); *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1181 (9th Cir. 2008) ("Because Appellants have provided no citation to the record or support for their claim . . . we hold that this argument is waived.").

**[4]** Because the issue of Qwest's good faith was never properly presented to, nor decided by, the PUC, Western is precluded from attempting to raise that issue for the first time

in the federal courts. The district court correctly dismissed Western's good faith claim for this reason, and we affirm.

### III.    Interconnection Agreement

The arbitration leading to the ICA resolved twelve specific technical or clerical issues on which Qwest and Western were unable to agree. The PUC adopted the arbitrator's decision in its entirety, and approved the ICA based on the ICA's compliance with the arbitrator's order. The district court found that the ICA as approved complied with the Act and upheld the PUC order in every respect. *W. Radio Servs. Co.*, 734 F. Supp. 2d at 1144, 1160. On appeal, Western challenges the resolution of eleven of the twelve arbitrated issues. On seven of the eleven issues,[6] we agree with the district court that the ICA complies with the Act, and affirm for substantially the reasons stated by the district court. *See id.* at 1149, 1153-60. Consequently, no further discussion of those issues is needed. On the issues of inter-tandem transport (Issue 1) and specific signaling technologies (Issue 3), we agree with the district court that the ICA complies with the Act, and affirm, but for slightly expanded or different reasons. On Issues 2 and 6, relating to the definition of the local calling area for purposes of reciprocal compensation, however, we find that the ICA does not comply with the Act. Accordingly, we reverse the district court's order upholding the PUC order approving the ICA in that regard only, and remand to the PUC for further proceedings.

#### A.    Inter-tandem transport of local calls ("Issue 1")

This issue involves the question of whether the Act requires Qwest to permit Western to interconnect with Qwest's net-

---

[6]These issues are Issues 5, 7, 8, 10, 11, 12, and 15, as numbered in the Arbitrator's Decision, and as adopted by the PUC. SER 212-25. The district court, in its opinion below, and the parties in their briefing, used these numbers to identify the issues, and for clarity we do so as well.

work at a single point in the state of Oregon, and then transport all of Western's telecommunications traffic from that single point to any destination statewide. Qwest's Oregon network encompasses multiple Local Access and Transport Areas ("LATAs"). Western contends that it should be able to interconnect in one LATA and reach all of Qwest's Oregon end users regardless of the LATA in which they are located. Qwest and the PUC, on the other hand, argue that Western must, at a minimum, interconnect via at least one point per LATA, because its network is designed to transport intra-LATA calls differently from inter-LATA calls.

We conclude, as did the district court, that the ICA's requirement that Western interconnect with Qwest's network via at least one point per LATA complies with the Act and its implementing regulations. Our reasons are twofold: (1) "interconnection" is distinct from, and does not include, "transport and termination," *see* 47 C.F.R. § 51.5, and (2) the FCC has consistently maintained that a LEC satisfies its duty under § 251(c)(2)(B) by permitting interconnection at a single point of interconnection *per LATA*.

### 1.   Factual background

We find it helpful first to provide some background on LATAs and their significance. Prior to 1982, local exchange service and interexchange (i.e., long-distance) service were all provided by a sanctioned, regulated monopoly, the American Telephone & Telegraph Company ("AT&T"). In 1982, to settle an anti-trust suit brought by the United States against AT&T, AT&T and the government entered into a consent decree divesting AT&T of the business of providing local exchange service. *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 226 (D.D.C. 1982). Thus were born the Bell Operating Companies ("BOCs"). *See id.* at 232. Also pursuant to the consent decree, the country was divided into geographically distinct LATAs, and each BOC was generally permitted to provide service only within a specific LATA. *See*

*United States v. W. Elec. Co., Inc.*, 569 F. Supp. 990, 993-94 (D.D.C. 1983); *id.* at 994 ("Most simply, a LATA marks the boundaries beyond which a Bell Operating Company may not carry telephone calls.") (footnote omitted). The BOCs were later combined to form seven regional BOCs, including Qwest's predecessor, U.S. West Communications. *See United States v. W. Elec. Co., Inc.*, 569 F. Supp. 1057, 1062 n.5 (D.D.C. 1983); *see also* 47 U.S.C. § 153(5) (defining BOCs). The regional BOCs were, in essence, the original ILECs.

Congress codified the prohibition on a LEC's provision of inter-LATA service in the 1996 amendments to the Act. Under the Act, the default rule is that a LEC may not provide inter-LATA service. *See* 47 U.S.C. § 271(a). However, Section 271 of the Act permits a LEC to provide certain in-region inter-LATA service (*i.e.*, within the state where the LEC was originally licensed to provide service, *see id.* § 271(i)(1)), if the LEC demonstrates to the satisfaction of the FCC that it has effectively opened its local market to competition, either by showing that it has entered into ICAs with competing carriers under Section 252 of the Act, or by showing that no such competing carrier has requested interconnection. *See id.* § 271(c).

Qwest has Section 271 authority to provide inter-LATA service in Oregon. *See Application by Qwest Commc'ns, Int'l, Inc.*, 18 FCC Rcd. 7325, 7326-27 (2003) (granting Qwest's application to provide such service in New Mexico, Oregon, and South Dakota). Consequently, Qwest's network in Oregon spans multiple LATAs. Each LATA, in turn, may comprise multiple local calling areas. When a Qwest customer makes a call, the call is routed via one of Qwest's Local Tandems or Access Tandems, depending on whether the call is local (i.e., originating and terminating within a single local calling area) or "local long distance" (i.e., originating and terminating in different local calling areas). Qwest routes local calls exclusively via Local Tandems, and uses Local Tandems exclusively to route local calls. Any call that spans local call-

ing areas is routed via an Access Tandem. Likewise, inter-LATA calls from one Qwest customer to another are routed via Access Tandems. According to the uncontroverted testimony before the PUC arbitrator, Qwest does not use Access Tandems to transport purely local calls.

Because Qwest's network is thus configured, the ICA as approved requires Western to "establish at least one (1) physical point of interconnection" in "each LATA in which Western wants to establish interconnection." ER 122 (ICA, Section IV.A.2). The PUC found, and the district court agreed, that nothing in the Act or its implementing regulations required an ILEC to transport a competitor's local exchange traffic between Access Tandems. Western nevertheless maintains that 47 U.S.C. § 251(c)(2) permits it to interconnect with Qwest's "network"[7] at a single, technically feasible point, and that Qwest must then deliver all of Western's traffic throughout Qwest's network, regardless of whether the destination is outside the specific LATA in which Western interconnects.

### 2.  Discussion

[5] The Act requires that an ILEC provide a "requesting telecommunications carrier" with interconnection "at any technically feasible point within the [ILEC's] network . . . ." 47 U.S.C. § 251(c)(2)(B). The Act does not define the general term "network" as used in § 251. Nor does it define "technically feasible."

---

[7]As discussed *infra*, the Act does not define "network" for purposes of Section 251. The ICA expressly governs the parties' provision of wireless-to-wireline and wireline-to-wireless services "within each LATA in which they both operate within the State of Oregon." ER 116 (ICA, Section I.A). Implicit in the ICA and the parties' arguments is the assertion that Qwest's service area in Oregon comprises at least two LATAs. The record is silent on the number of LATAs in Oregon, or the relationship between the borders of the relevant Major Trading Area and the relevant LATAs.

However, the FCC has provided some guidance in its First Report and Order and various regulations. *See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996; Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, 11 FCC Rcd. 15,499, 15,599, ¶¶ 192-93 (1996) ("First Report and Order") (referencing solicitation of comment on the definition of "technically feasible"). In implementing regulations, the FCC provides that interconnection will be deemed technically feasible "absent technical or operational concerns that prevent the fulfillment of a request by a telecommunications carrier . . . ." 47 C.F.R. § 51.5. Purely "economic . . . concerns," however, play no role in the determination of technical feasibility. *Id.*; *see* First Report and Order ¶ 198 ("We conclude that the term 'technically feasible' refers solely to technical or operational concerns, rather than economic, space, or site considerations."); First Report and Order ¶ 199 ("[T]he 1996 Act bars consideration of costs in determining 'technically feasible' points of interconnection or access."). At the same time, the FCC has also noted that the costs of " 'technically feasible' but expensive interconnection" must be borne by the requesting carrier, First Report and Order ¶ 199, and the Supreme Court has recently observed that the FCC has not closed the door on considerations of reasonableness in determining certain aspects of an incumbent LEC's interconnection duties, *see Talk Am., Inc. v. Mich. Bell. Tel. Co.*, 131 S. Ct. 2254, 2262 n.4 (2011) ("The [FCC] suggests here, as it has before, that additional considerations of cost or reasonableness might be appropriate if a competitive LEC were to request that an incumbent LEC build new entrance facilities for interconnection. . . . We express no view on the matter.").

      a.   "Interconnection" does not include "transport and termination" of calls

**[6]** The regulations implementing Section 251 specifically define "interconnection" as "the linking of two networks for

the mutual exchange of traffic. This term does not include the transport and termination of traffic." 47 C.F.R. § 51.5. As the Supreme Court has noted, " 'transport and termination of traffic' is subject to different regulatory treatment than interconnection." *Talk Am.*, 131 S. Ct. at 2263. Nothing in the Act requires the ILEC to *transport and terminate* a requesting carrier's traffic in any "technically feasible" manner. Thus, to the extent that this issue involves not the question of how interconnection will be established, but rather the question of how, once interconnection is established, mutually exchanged traffic will be transported and terminated, the "technically feasible" language of Section 251(c)(2)(B) is not the test. Rather, the ICA's resolution of this issue comports with the Act so long as it comports with the Act's transport and termination provisions, i.e., the "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications," 47 U.S.C. § 251(b)(5), and the pricing standards relevant to such arrangements, *see id.* § 252(d)(2). Whether the ICA complies with the Act's reciprocal compensation provisions for the transport and termination of telecommunications is addressed *infra*. As pertinent to the inter-tandem transport issue, however, the fact that the ICA does not require Qwest to *transport* Western's local traffic across access tandems, even though it may be "technically feasible" to do so, does not violate Qwest's duty to provide *interconnection* at any "technically feasible" point.

> b.   Interconnection at "any technically feasible point" means interconnection "at a single POI per LATA"

**[7]** Moreover, the FCC has consistently interpreted Section 251(c)(2)(B) to mean that "competitive LECs have the option to interconnect at a single POI [point of interconnection] *per LATA*." *See In re Connect Am. Fund*, 26 FCC Rcd. 4554, 4775, ¶ 682 & n.1088 (2011) (emphasis added) (*citing Application by SBC Commc'ns Inc.*, 15 FCC Rcd. 18354, 18390, ¶ 78 (2000)); *see also MCIMetro Access Transmission Servs.,*

*Inc. v. BellSouth Telecomm., Inc.*, 352 F.3d 872, 877 (4th Cir. 2003) ("In exercising its right under § 251(c)(2)(B) to designate a technically feasible POI, MCI decided to interconnect with BellSouth's network at only one point in the North Carolina local access and transport area . . . ."). While these decisions have addressed interconnection between an incumbent LEC and a competing LEC, as opposed to between an ILEC and a CMRS provider, both LECs and CMRS providers are "telecommunications carrier[s]" within the meaning of the Act, *see* 47 U.S.C. § 153(51), and we see no reason why, absent any statute or regulation to the contrary, this general rule would not also extend to such interconnection.

Admittedly, these decisions are not squarely on point insofar as they address whether a competing LEC must interconnect at more than one POI per LATA, and not whether a CMRS provider must interconnect at least once in each LATA. We note, however, by analogy, that in the context of proceedings under Section 271 to determine whether an ILEC has complied with the competitive interconnection requirements of Sections 251(c)(2) and 252 (d)(1) of the Act such that it may provide inter-LATA service, the FCC expressly noted that it has never adopted the precise view put forth here by Western—i.e., that the Act requires an ILEC to provide "*a single point of interconnection for contiguous LATAs* in states or regions where an ILEC has obtained Section 271 authority." *In re Application by Verizon New England Inc.*, 17 FCC Rcd. 7625, 7651, ¶ 47 (2002) (internal quotation marks omitted) (emphasis added). "We note that the Commission has never articulated such a requirement. Accordingly, it would be inappropriate . . . to conclude that [the ILEC] does not comply with [the competitive interconnection requirement] for failure to provide interconnection on such terms." *Id.* Similarly, it would be "inappropriate" to conclude that Qwest's refusal to transport all of Western's local traffic from a single access tandem to any point in Qwest's multi-LATA network violates the Act.

**[8]** For the foregoing reasons, we conclude that the ICA's requirement that Western interconnect to Qwest's network via at least one "physical point of interconnection" per LATA—stated another way, the ICA's failure to provide for inter-tandem transport of Western's local calls—meets the requirements of Section 251 of the Act. Accordingly, we affirm the district court's order upholding that part of the PUC's determination.

B.    Dual Tone Multi-Frequency and Dial Pulse signaling ("Issue 3")

At issue here is the type of signaling technology that Western is entitled to demand at a given point or points of interconnection if it uses Type 1 interconnection.[8] Western would like to use Dual Tone Multi-Frequency ("DTMF") and Dial Pulse signaling, which are forms of in-band signaling associated with older touch-tone and rotary-dial telephones. Western contends that Qwest must offer interconnection using these older forms of signaling because they are "technically feasible" and because Qwest still provides them to certain existing customers. Qwest maintains that these are outmoded forms of signaling that are being phased out of use in Qwest's network, and that the Act does not require Qwest to "reconfigure its network at substantial expense" to provide such signaling where it is not already available. Qwest Opening Br. at 40.

We agree with the district court that the ICA's failure to provide blanket access to DTMF and Dial Pulse signaling does not violate the Act. We do so for different reasons, however. We conclude that the forms of signaling technology dis-

---

[8]Type 1 interconnection is interconnection through a switch owned by Qwest, as opposed to Type 2 interconnection, which would be through a switch owned by Western as the requesting carrier. Of the thirty wireless service providers in Oregon with which Qwest has ICAs in place, twenty-four use Type 2 interconnection.

puted here are not a "method of obtaining interconnection," within the meaning of the FCC's regulations. Therefore, an ILEC is not obligated to provide such signaling technology to a requesting carrier under Section 251(c)(2) and its implementing regulations, and the ICA as approved does not violate the Act. Accordingly, we affirm the district court's upholding of the PUC orders in this regard.

### 1.   Factual background

Uncontroverted record evidence before the PUC arbitrator showed that in Type 1 interconnections, Qwest's default form of signaling is Multi-Frequency wink-start signaling ("wink-start MF"); that Qwest provides DTMF and Dial Pulse signaling only to certain longstanding wholesale customers on a "grandfathered basis," and it is phasing the technology out "in favor of newer, more efficient technologies," SER 155;[9] that Qwest does not "actively offer[ ]" or "actively deploy[ ]" DTMF or Dial Pulse signaling, SER 155-56; and that "most if not all" of the CMRS providers in Oregon with which Qwest has ICAs in place use wink-start MF, and not DTMF or Dial Pulse, SER 156.

The ICA as approved provides that the default form of signaling used in Type 1 interconnection will be wink-start MF, but that where DTMF and Dial Pulse are "available," they may be requested through a "Special Request Process." The Special Request Process, in turn, is a means for Western to request "non-standard" features and for the parties to negotiate whether and on what terms such features will be made available. The PUC adopted the arbitrator's report, which concluded that the Special Request Process was a reasonable way for a competitor like Western to request DTMF or Dial Pulse at "specific locations," and that Western's argument that DTMF and Dial Pulse were "technically feasible" was

---

[9]Western acknowledges that it too is phasing out the use of Dial Pulse signaling.

nonresponsive to Qwest's argument that the technology was not "available." The district court upheld the PUC's order, finding that "[r]equiring Qwest to provide interconnection through outdated technologies [would be] contrary to the purpose of the Act because it could stifle competition, result in lower-quality services, and hinder the development of new technologies." *W. Radio Servs. Co.*, 734 F. Supp. 2d at 1152.

### 2.   Discussion

#### a.   ILECs must provide any "technically feasible method of obtaining interconnection"

**[9]** The Act obligates ILECs to provide "interconnection" "for the facilities and equipment" of a requesting carrier "at any technically feasible point." 47 U.S.C. § 251(c)(2)(B). The FCC has interpreted this provision to mean that an ILEC must provide "any technically feasible *method* of obtaining interconnection . . . ." *See* 47 C.F.R. § 51.321(a) (emphasis added). That a method of obtaining interconnection has previously been successfully established at one point in an ILEC's network is "substantial evidence that such method" of obtaining interconnection is "technically feasible in the case of substantially similar network premises or points." *Id.* § 51.321(c). An ILEC that "denies a request for a particular method of obtaining interconnection" bears the burden of proving to the relevant state commission that the requested method "is not technically feasible." *Id.* § 51.321(d). Thus, this issue turns on whether DTMF or Dial Pulse signaling technology at a given point of interconnection constitutes a "method of obtaining interconnection." If it is a "method of obtaining interconnection," then Qwest must provide it where it is technically feasible to do so. If it is not, then Section 251 of the Act does not obligate Qwest to provide it, regardless of whether it is technically feasible.

b.    "Method of obtaining interconnection" refers to a physical link between networks

When called upon to interpret a federal statute or the regulations implementing it, "we apply traditional rules of construction and, where required, administrative deference." *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 392 (9th Cir. 2011). Where neither the language of the statute nor that of the regulation speaks "directly" to the question at issue, we will give appropriate deference to the agency's interpretation of its own regulations, unless the interpretation is plainly erroneous or inconsistent with the regulation, *id.* (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)), or there is reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question, *Talk Am., Inc.*, 131 S. Ct. at 2261 (citing, *e.g.*, *Auer*, 519 U.S. at 461).

Neither the Act nor the FCC's regulations directly answer the question of whether a given signaling system constitutes a "method of obtaining interconnection." The non-exhaustive list of "technically feasible methods" identified by the FCC in 47 C.F.R. § 51.321(b) includes physical or virtual "collocation" (i.e., the installation of a competitor's equipment on the ILEC's premises and the physical or remote monitoring of such equipment, *see id.* § 51.5) and "meet-point interconnection arrangements" (i.e., where each carrier builds out its own network to a meet point where the interconnection takes place, *see id.*). Such methods also include the leasing of "entrance facilities" (i.e., the lines connecting a competitor's switch to an ILEC's switch), *see Talk Am. Inc.*, 131 S. Ct. at 2258; *Pac. Bell Tel. Co.*, 621 F.3d at 841-42.

**[10]** The FCC has also defined "interconnection" as "the linking of two networks for the mutual exchange of traffic," *see* 47 C.F.R. § 51.5.[10] Interconnection expressly does *not*

---

[10]The ICA as approved defines "interconnection" as "the connection of separate pieces of equipment, facilities, or platforms between or within

include "transport and termination," *see id.* When the FCC initially issued the regulation thus defining "interconnection," the FCC concluded that " 'interconnection' under Section 251(c)(2) refers *only* to the *physical linking* of two networks for the mutual exchange of traffic," First Report and Order ¶ 176 (emphasis added), and noted that Section 251(c)(2) explicitly refers to "the physical linking of *equipment and* facilities," *id.* (emphasis added); *see also* 47 U.S.C. § 252(d)(1) (regarding a state commission's duty to determine a "just and reasonable rate for the interconnection *of facilities and equipment* for purposes of [Section 251(c)(2)]") (emphasis added). The FCC has consistently maintained that interconnection refers only to "physical linking," *see In re Verizon Maryland Inc.*, 18 FCC Rcd. 5212, 5419-20, ¶ 17 (2003); *In re Verizon New England Inc.*, 17 FCC Rcd. 7625, 7740-41, ¶ 17 (2002); *In re SBC Commc'ns Inc.*, 16 FCC Rcd. 20,719, 20,853-54, ¶ 17 (2001).

Similarly, courts confronting the scope of "interconnection" have rejected overly broad readings of the term. In *MCI-Metro Access Transmission Services*, the Fourth Circuit addressed a dispute between LECs over a provision in their ICA that permitted the ILEC to charge the competing LEC for certain incremental costs of calls originating on the ILEC's own network. 352 F.3d at 874. The competing LEC argued that this contravened 47 C.F.R. § 51.703(b), the FCC regulation expressly prohibiting a LEC from assessing charges for traffic that originates on its own network. *Id.* at 877. The ILEC argued that because the costs were related to transporting the call from its point of origin to the single point of interconnection between the parties' networks, the costs were "costs of interconnection" for which the ILEC properly could be reimbursed. *Id.* at 878.

---

networks for the purpose of transmission and routing of Telephone Exchange Service traffic and Exchange Access traffic." ER 119 (ICA, Section III.5).

The court rejected the ILEC's implied argument that "interconnection must be interpreted broadly to include not only the physical act of connecting the networks, but also the ongoing state of interconnectivity." *Id.* That a particular cost was "necessitated by the *ongoing state of interconnectivity* at [the competing LEC's] chosen POI," *id.* at 879 (emphasis added), did not, in the Fourth Circuit's opinion, suffice to make it a cost of *interconnection* such that the ILEC could shift that cost to the competing LEC, *id.* at 881. "[B]ecause the cost of interconnection is only the one-time cost associated with the physical act of linking one network to another and not the recurring cost of transport and termination of traffic, the charge imposed by [the ILEC] here cannot be characterized as a 'cost of interconnection.' " *Id.* at 879.

Moreover, in *Competitive Telecommunications Ass'n v. FCC*, the Eighth Circuit addressed a direct challenge to the FCC's rule defining "interconnection." 117 F.3d 1068, 1071 (8th Cir. 1997). There, the petitioner argued that Section 251(c)(2)'s command to provide "interconnection . . . for the transmission and routing of telephone exchange service and exchange access" meant that "interconnection" must necessarily include "transmission and routing." *Id.* (internal quotation marks omitted). Rejecting the argument that "interconnection" meant something more than just physical linkage, the court concluded that "Congress intended 'for the transmission and routing . . .' only to describe *what the interconnection*, the physical link, *would be used for*," *id.* at 1071-72 (emphasis added). Thus, the FCC's interpretation of "interconnection as a physical link, and only a physical link, . . . for the purposes of § 251(c)(2) . . . 'is based on a permissible construction of the statute.' " *Id.* at 1073 (*quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

### c.   Signaling technology does not implicate the physical link

**[11]** From these authorities we conclude that "interconnection" within the meaning of Section 251(c)(2) and as inter-

preted by the FCC means the temporally discrete, "physical *act* of linking one network to another," *MCIMetro*, 352 F.3d at 879 (emphasis added), through "facilities and equipment," 47 U.S.C. § 251(a)(1), (c)(2), thus permitting "the mutual exchange of traffic," 47 C.F.R. § 51.5. Interconnection does not encompass "transport and termination" of traffic, *id.*, or "recurring" issues relating to how traffic is transported and terminated, *MCIMetro*, 352 F.3d at 879. The particular signaling system, by which call-specific information is communicated, does not, in our view, implicate the one-time "physical linkage" of "facilities and equipment." Rather, it relates to how traffic is originated and transported. Signaling, in other words, relates to the "ongoing state of interconnectivity," *id.* at 879, and is "what the interconnection, the physical link, [is] used for," *Competitive Telecomm.*, 117 F.3d at 1071-72.

**[12]** The conclusion that signaling is separate from "facilities and equipment" is bolstered by 47 C.F.R. § 51.5, the regulation defining "network element." There, the FCC defines "network element" to include discretely both "a facility or equipment used in the provision of a telecommunications service," and also "features, functions, and capabilities that are provided by means of such facility or equipment, including . . . signaling systems." *Id.* Thus, a particular signaling system is a "feature[ ], function[ ], [or] capabilit[y]," and therefore not encompassed within an ILEC's "duty to provide [interconnection] for the facilities and equipment of any requesting carrier" under 47 U.S.C. § 251(c)(2).

### 3.  Conclusion

**[13]** For the foregoing reasons, we hold that DTMF and Dial Pulse signaling technology do not constitute "method[s] of achieving interconnection" within the meaning of 47 C.F.R. § 51.321(a) such that an ILEC would be obligated to provide them if technically feasible under Section 251(c)(2). In this case, the ICA, which provides that DTMF and Dial Pulse signaling will be provided where "available," subject to

the mutually negotiated Special Request Process, does not violate the Act. Accordingly, we affirm the district court's order upholding the PUC's determinations in this regard.[11]

C.  Reciprocal compensation for intra-MTA traffic ("Issues 2 and 6")

Two of the issues the parties asked the arbitrator to resolve involved the "definition of non-local calls" (Issue 2) and the

---

[11]As noted *supra*, the PUC's apparent reason for rejecting Western's argument that DTMF and Dial Pulse signaling were "technically feasible" and must be made available was that it was most "reasonable" to require Qwest to provide such signaling only where available. SER 207-08, 216-17. The district court's rationale was that requiring Qwest to provide blanket access to such signaling would be "contrary to the purpose of the Act because it could stifle competition, result in lower-quality services, and hinder the development of new technologies." *W. Radio Servs. Co.*, 734 F. Supp. 2d at 1152.

Thus, neither the PUC nor the district court relied upon our interpretation of "method of obtaining interconnection" in 47 C.F.R. § 51.321(a) to determine that Qwest was not required to provide blanket access to DTMF and Dial Pulse signaling. And it is true that a reviewing court generally may not affirm the action of an administrative agency on grounds upon which the agency itself did not expressly rely. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). But *Chenery* involved judicial review of a discretionary determination of the federal agency charged with interpreting the relevant federal statute. *See id.* at 85, 94-95. Such is not the case before us.

The peculiar nature of this statutory scheme calls for federal court review of the actions of a state agency with a relatively limited role. Under the Act, a state commission is obligated to ensure that an arbitrated ICA complies with the Act and its implementing regulations, but the state commission has no discretion or authority actually to interpret the statute or regulations. *See* 47 U.S.C. § 252(c)(1), (e)(6). Moreover, the Act contains no provision for remanding such actions to the FCC—the federal agency that is charged with interpreting the Act and implementing its provisions —for its resolution. Consequently, where, as here, review is sought under Section 252(e)(6) of a state commission's determination with respect to an ICA, *Chenery* does not prevent this Court from interpreting the statute and regulation in the first instance.

"proper definition of [local traffic] for purposes of calculating reciprocal compensation" (Issue 6). On both issues, which turn on the definition of "non-local traffic," the arbitrator adopted Qwest's position. Consistent with the arbitrator's findings, the ICA as approved provides that "local traffic" is subject to reciprocal compensation arrangements while "non-local traffic" is subject to access charges under a separate tariff. ER 127 (Section IV.D.1; Section IV.C.4); ER 129 (Section IV.H.1). The ICA defines "non-local traffic" to include "traffic originated by one Party, carried by an IXC, and terminated by the other Party," and provides that "Reciprocal Compensation does not apply to Non-Local Traffic." ER 127 (ICA, Section IV.C.4.). Thus, the issue is whether the involvement of an IXC in traffic that would otherwise be local converts that traffic into "non-local traffic."

Western contends that all traffic that originates and terminates within the same Major Trading Area ("MTA")[12] should be considered "local traffic" subject to reciprocal compensation. Western maintains its challenge to the provisions of the ICA that exempt intra-MTA, interexchange traffic from reciprocal compensation where an IXC is involved. Qwest and the PUC do not dispute that intra-MTA traffic exchanged between Qwest and Western is "local traffic" subject to reciprocal compensation. Rather, they contend, and the district court agreed, that the involvement of an IXC in the transmission of such traffic trumps the intra-MTA nature of the call, taking it out of the reciprocal compensation regime.

We conclude that the arbitrator, PUC, and district court erred in determining that the involvement of an IXC altered the parties' obligation to pay reciprocal compensation for telecommunications traffic that originates and terminates within the same MTA.

---

[12]An MTA is a unique, geographically defined service area within which a wireless provider is licensed to provide service. *See* 47 C.F.R. § 24.202(a).

**[14]** The Act requires that reciprocal compensation arrangements apply to the "transport and termination of tele-communications" between LECs. 47 U.S.C. § 251(b)(5). The regulations extend this duty to telecommunications traffic exchanged between LECs and CMRS providers. 47 C.F.R. § 20.11(b), (c). In the regulation addressing the scope of the transport and termination pricing rules, the FCC distinguishes between traffic exchanged between a LEC and a CMRS provider and traffic exchanged between a LEC and a non-CMRS provider. *See* 47 C.F.R. § 51.701(b). In the former situation, reciprocal compensation applies to all traffic exchanged "that, at the beginning of the call, originates and terminates within the same Major Trading Area . . . ." *Id.* § 51.701(b)(2). In the latter situation, reciprocal compensation applies to all traffic exchanged *except* "telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access . . . ." *Id.* § 51.701(b)(1). Traffic carried by an IXC, which is access-based rather than reciprocal-compensation-based, falls within this regulatory exception to the reciprocal compensation rules. *See In re Developing a Unified Intercarrier Compensation Regime*, 20 FCC Rcd. 4685, 4687-88, ¶ 5 (2005) ("Federal and state access charge rules govern the payments that [IXCs] and [CMRS] providers make to local exchange carriers . . . that originate and terminate long-distance calls, while the reciprocal compensation rules established under section 251(b)(5) of the Act generally govern the compensation between telecommunications carriers for the transport and termination of calls not subject to access charges.").

Qwest and the PUC, relying on the FCC's First Report and Order, argue that the FCC has exempted interexchange traffic carried by an IXC from the reciprocal compensation regime even as between LECs and CMRS providers. See First Report and Order ¶ 1034. Their argument, however, overlooks the fact that since the 1996 First Report and Order, the FCC revised the relevant regulation to exempt such traffic from the reciprocal compensation regime as between LECs and non-

CMRS providers, yet included *no such exemption* for the reciprocal compensation regime *as between LECs and CMRS providers.*[13]

Two of our sister circuits have rejected the argument put forth here by Qwest and the PUC. In *Atlas Telephone Co. v. Oklahoma Corp. Commission*, 400 F.3d 1256 (10th Cir. 2005), the Tenth Circuit addressed this precise question. There, in a dispute between CMRS providers and rural ILECs over reciprocal compensation for traffic involving an IXC, the court evaluated the requirements of 47 U.S.C. § 251(b)(5), as implemented by 47 C.F.R. §§ 51.701 and 51.703, and held that the determinative factor was the intra-MTA nature of the call, and not the involvement of an IXC. *Atlas*, 400 F.3d at 1264. "[T]he mandate expressed in these provisions is clear, unambiguous, and on its face admits of no exceptions. . . . Nothing in the text of these provisions provides support for the . . . contention that reciprocal compensation requirements do not apply when traffic is transported on an IXC network." *Id.* Similarly, in *Alma Communications Co.*, 490 F.3d 619, the Eighth Circuit rejected the LEC's argument that it was not obligated to pay reciprocal compensation to a CMRS provider

---

[13]After these 2001 revisions, the regulation provides, in pertinent part:

> For purposes of this subpart, telecommunications traffic means:
>
> > (1) Telecommunications traffic exchanged between a LEC and a telecommunications carrier other than a CMRS provider, except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access . . . ; or
> >
> > (2) Telecommunications traffic exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same Major Trading Area, as defined in [47 C.F.R.] § 24.202(a) . . . .

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic*, 66 Fed. Reg. 26,800, 26,806 (May 15, 2001), codified as amended at 47 C.F.R. § 51.701(b).

when calls were routed through an IXC. "[We] reject [the LEC's] argument that the involvement of an [IXC] at the originating end of the call means that the call cannot be subject to reciprocal compensation. . . . [C]alls from a land line to a cell phone placed and received within the same major trading area are local calls, subject to the reciprocal compensation arrangements ordained by . . . 47 U.S.C. § 251(b)(5)." *Id.*

Further, we note that the FCC has issued a new report and order, effective December 29, 2011, that cites this case law approvingly and clarifies that in the LEC-CMRS context, this is indeed how the reciprocal compensation rules are to operate. *See Connect America Fund*, 76 Fed. Reg. 73,830, 73,838 (Nov. 29, 2011) ("[W]e affirm that all traffic routed to or from a CMRS provider that, at the beginning of a call, originates and terminates within the same MTA, is subject to reciprocal compensation, without exception."). While the PUC and the district court obviously did not have this clear guidance available to them at the time they rendered their respective decisions below, the FCC's newly promulgated interpretation of the statute must yet be given effect. As this court has previously observed,

> [T]he district court's role under the Act is to determine whether the agreement . . . meets the requirements of [Sections 251 and 252]. The Act gives the FCC authority to establish regulations implementing the Act. Accordingly, the FCC's implementing regulations—including those . . . newly promulgated —must be considered part and parcel of the requirements of the Act. They must therefore be given effect in this case, even if the [state commission] did not err by failing to apply them at the time of its original arbitration decisions.

*Jennings*, 304 F.3d at 957 (internal quotation marks and citations omitted).

**[15]** While not critical to our holding, it is also worth noting that with this new report and order, the FCC again revises 47 C.F.R. § 51.701(b) but leaves untouched the aforementioned distinction between CMRS providers and non-CMRS providers. *See Connect America Fund*, 76 Fed. Reg at 73,855 (to be codified at 47 C.F.R. § 51.701(b)). Thus, regardless of how the FCC may originally have interpreted the significance of the involvement of an IXC in the transport and termination of an otherwise local call, the FCC's subsequent changes to the relevant regulation, confirmed by its recent report and order, make plain that the involvement of an IXC has no effect on the obligations of LECs and CMRS providers to pay reciprocal compensation for traffic "that, at the beginning of the call, originates and terminates within the same Major Trading Area . . . ." 47 C.F.R. § 51.701(b)(2). Accordingly, like the Tenth and Eighth Circuits, we reject the contention that such traffic is somehow "transformed into a long-distance call simply by being routed through a long-distance carrier." *Alma*, 490 F.3d at 625. We hold that the ICA's provisions (1) defining "non-local traffic" as including intra-MTA traffic carried by an IXC, and (2) exempting such "non-local traffic" from reciprocal compensation, violate the Act. We reverse that portion of the district court's opinion to the contrary, and remand the case to the PUC for further proceedings consistent with this opinion.

    D.    Remaining issues ("Issue 5," "Issue 7," "Issue 8," "Issue 10," "Issue 11," "Issue 12," and "Issue 15")

On the remaining issues resolved by the arbitrator, we hold that the ICA complies with the requirements of the Act, for substantially the reasons stated in the district court's opinion. Accordingly, we affirm the district court's order upholding the PUC's approval of the ICA as it relates to those issues.

## CONCLUSION

*Western Radio Services Co. v. Qwest Corp.*, Civ. No. 05-159-AA, 2009 WL 1312425 (D. Or. May 5, 2009), is

AFFIRMED. That portion of *Western Radio Services Co. v. Qwest Corp.*, 734 F.Supp. 2d 1139 (D. Or. 2010), upholding the PUC's determinations on Issues 2 and 6 is REVERSED; all other portions are AFFIRMED. The case is REMANDED to the PUC for further proceedings not inconsistent with this opinion. Each side shall bear its own costs on appeal.

AFFIRMED in part, REVERSED in part, and REMANDED.

## APPENDIX: ACRONYMS USED IN THIS OPINION

| | |
|---|---|
| BOC | Bell Operating Company |
| CMRS | Commercial Mobile Radio Service |
| DTMF | Dual Tone Multi-Frequency signaling |
| FCC | Federal Communications Commission |
| ICA | Interconnection Agreement |
| ILEC | Incumbent Local Exchange Carrier |
| IXC | Interexchange Carrier |
| LATA | Local Access and Transport Area |
| LEC | Local Exchange Carrier |
| Wink-start MF | Wink-start Multi-Frequency Signaling |
| MTA | Major Trading Area |
| POI | Point of Interconnection |
| PUC | Oregon Public Utilities Commission |
| ER | Excerpt of Record, as filed with this Court by Western |
| SER | Supplemental Excerpt of Record, as filed with this Court by Qwest |